IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Viands Concerted, Inc.,                    :

                 Plaintiff            :          Civil Action 2:08-cv-00914

  v.                                      :          Judge Sargus

Reser's Fine Foods, Inc., *et al.*,        :          Magistrate Judge Abel

              Defendants             :

# Report and Recommendation

Plaintiff Viands Concerted, Inc. brings this action under 28 U.S.C. § 1332 alleging that defendant Reser's Fine Foods, Inc. and Mark A. Reser breached a contract not to disclose Viands' trade secrets and proprietary information, that defendants Reser's, Mark Reser, Harris Food Group, Inc. ("HFG"), and Craig Linton misappropriated and used Viands' trade secrets to its competitive disadvantage and tortiously interfered with Viands' contract with T.G.I. Friday's, and HFG and Craig Linton engage in unfair competition against Viands.  This matter is before the Magistrate Judge for report and recommendation for the disposition of Viands' September 26, 2008 motion for a preliminary injunction (doc. 4).  A hearing on the motion was held October 23 and 24, 2008.

## Summary of factual issues

T.G.I. Friday's purchased 100% of its refrigerated creamy mashed potatoes from Viands.  Reser's manufactured the mashed potatoes for Viands and delivered them to T.G.I. Friday's warehouse distribution centers.  Reser's is contractually bound not to

disclose Viands' confidential proprietary information.  Reser's also may not sell the mashed potatoes directly to T.G.I. Friday's.  In late August 2008, T.G.I. Friday's chose HFG to supply 100% of its mashed potatoes needs.  Reser's agreed to manufacture them for HFG.

Viands maintains that it communicated confidential proprietary business information to Reser's, which it is now using to manufacture mashed potatoes for HFG.  It also argues that Reser's is effectively selling the mashed potatoes directly to T.G.I. Friday's. Viands alleges that Reser's disclosure of its confidential proprietary information and its sales to T.G.I. Friday's have caused Viands irreparable harm.  Viands will go out of business if an injunction is not issued.

## Findings of fact[1]

Viands creates T.G.I. Friday's creamy mashed potatoes.  Viands is owned and operated by David Craig Linton and Stephany Wilkes.  Their son, defendant Craig Linton, worked ten years for Viands, ending April 3, 2006.  In 2001, Viands worked with T.G.I. Friday's to develop a recipe and specifications for refrigerated creamy mashed potatoes.  The recipe and specifications are owned by T.G.I. Friday's.  (Pl.'s Ex. 23.)

Viands contracted to supply the creamy mashed potatoes to T.G.I. Friday's.  Defendant Reser's contracted to produce the potatoes and deliver them to Performance Food Group ("PFG"), an independent, nationwide company that warehouses and distributes food products for T.G.I. Friday's and other restaurant chains.

---

[1]The findings of fact and conclusions of law made in ruling on a motion for preliminary injunction are not binding at a trial on the merits.  *See, United States v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir. 2004).

Viands' contract with Reser's.  Reser's signed a nondisclosure agreement drafted by Viands that applied to the disclosure by Viands to Reser's "of information pertaining to" T.G.I. Friday's refrigerated creamy mashed potatoes.  The "formula for the components" of the mashed potatoes was deemed Viands' proprietary information, which Reser's contracted to hold "in strict confidence" and not to divulge to any third person.[2]  (Pl.'s Ex. 1, ¶¶ 1 and 2.)  Reser's also "agree[d] not to sell to [Viands'] current customer [T.G.I. Friday's] for a period of twenty-four (24) months should [it] be contacted directly by [T.G.I. Friday's] or should [Reser's] contact [T.G.I. Friday's] directly . . . ."  *Id.*, ¶ 4.

The contractual arrangement was continued through supply agreements signed in October 2003 and August 2005.  The latter agreement ended March 1, 2008 and was not renewed.  Reser's continued to supply Viands with mashed potatoes by purchase order.  Reser's President, Mark Reser, testified that 65% - 75% of their business is by purchase order.

Reser's.  Reser's Fine Foods operates 13 manufacturing facilities that produce refrigerated prepared foods products.  Reser's is a family owned business.  Its broad lines are 55% deli salads, 35% manufacture side dishes and potato products, and 10% Mexican food

---

[2]Viands protected its confidential proprietary business information.  It required its agents, customers, suppliers and employees to sign confidentiality and non-disclosure agreements.  (Pl.'s Ex. 14.)  In 2005, Viands learned that Reser's might have inadvertently disclosed the price it charged Viands to PFG.  Viands' lawyer wrote Reser's to communicate Viands' concern and demanded that the nondisclosure agreement be honored.  (Pl.'s Ex. 9.)  Reser's responded that it recognized its obligation to protect Viands' confidential proprietary information.  It conducted an investigation and determined that no price information had been sent to PFG.  It changed its procedures to insure that bills to Viands would not be sent by mistake to PFG.  (Pl.'s Ex. 10.)

3

products. It has annual revenue of just under $700 million.  During the peak summer

season, it has 2,400 employees.

Reser's channels of distribution are:

- retail packaged products (Reser's brand, national brands and store brands) and
- restaurant food business (sales through distributors such as Cisco, national account sales to restaurant chains, and third party sales to restaurant chains).

One Reser's manufacturing facility has four lines that produce mashed potato products.  There are 30–35 different recipes.  The line has to be set up differently to produce each product.  A facility runs 5-6 recipes on an average day.

Reser's developed a process for producing refrigerated mashed potato products for national restaurant chains years before first making the T.G.I. Friday's refrigerated creamy mashed potatoes for Viands.  For each mashed potato product, Reser's selects the vendors for the potatoes.  At the facility, the potatoes are washed, steam peeled, segmented, optically sorted for defects, flumed to cook process, cooked, augered in a ricer.  The dairy is then delivered to the product.  Each potato product has a different dairy blend of margarine, butter, heavy cream, sour cream, and so on.  Reser's buys the dairy and blends it at one of their production facilities.  A spice blend is also added to the product.

Once the product is complete, it is placed in 5 pound poly bags.  Eight bags are loaded into corrugated boxes.  These boxes are delivered to the customer by truck.  Reser's owns Southern Cal Transport, which has 115 semi tractor-trailers and 120 bobtail trucks.  Southern Cal Transport routes the trucks.  About 40% of the product is carried on Reser's trucks.  The other 60% is transported by third party common carrier.  Reser's routes those

4

trucks.

Viands' contribution to Reser's manufacture of T.G.I. Friday's creamy mashed
potatoes.  A recipe to make mashed potatoes in a restaurant kitchen cannot be used to
produce high volumes of refrigerated product at a plant.  Viands used its expertise to
create a recipe and specifications for production that would yield a product acceptable to
T.G.I. Friday's.

T.G.I. Friday's will not use a product in its restaurants unless it meets its specifica-
tions.  The mashed potatoes are tested in T.G.I. Friday's laboratory/kitchen, taste tested by
consumers, and market tested in selected markets.

In 2001, Viands was using INK to produce its mashed potatoes product.  Viands
went to the INK plant before the first floor run and made adjustments to the equipment.
There are a number of variables in producing a refrigerated mashed potato product on a
plant product assembly line.  Each has to be adjusted correctly to get a consistent product.

At the last moment, Viands determined that INK did not have the capacity to pro-
duce the T.G.I. Friday's creamy mashed potatoes.  Viands selected Reser's, an experienced
producer of refrigerated mashed potato products.  In just six weeks, Reser's was producing
the T.G.I. Friday's mashed potatoes.

David Linton testified that Viands brought the expertise–everything it had put to-
gether working with INK–to Reser's.  Viands went to Reser's Pasco, Washington plant and
assisted Reser's in setting up the line to produce creamy mashed potatoes acceptable to
T.G.I. Friday's.  They were able to get production started in just six weeks.

No evidence Viands communicated proprietary information to Reser's.  However,

5

plaintiff has failed to offer evidence from which a finder of fact could conclude by a preponderance that Viands communicated proprietary business information subject to the nondisclosure agreement that enabled Reser's to produce the T.G.I. Friday's creamy mashed potatoes.  David Linton testified that he visited Reser's production facilities 3-4 times, but he never personally made adjustment to the line or other processes. He testified that Viands' employees went to the Pasco plant and communicated confidential proprietary information to Reser's, but he was unable to offer any specifics.  Craig Linton, who went on the pre-production trip to the plant, testified that the Viands team observed but did not set up the line.

   HFG went after Viands' T.G.I. Friday's mashed potatoes business.  Calvin Harris, the owner and President of Harris Food Group, worked for T.G.I. Friday's as a R&D chef in 2001 and created the creamy mashed potatoes recipe.  In addition to his two years with T.G.I. Friday's, Harris was an executive R&D chef at Arby's for 3½-4 years, and a Senior Vice President for 2 years at Burger King in charge of its R&D department.   In January 2007, he started HFG.  Harris went to people he knew at T.G.I. Friday's looking for business.  In July 2007, Sean Murphy, a R&D chef for T.G.I. Friday's, told Harris that he could get a contract to supply creamy mashed potato.  T.G.I. Friday's gave Harris the recipe, specifications and a sample of the current product.

   Craig Linton joined HFG as Vice President in late August 2007.  By that time, Harris was already developing the creamy mashed potato product for T.G.I. Friday's.  Fresh Vegetable Technology produced the product.  In December 2007, the product was approved by T.G.I. Friday's for production beginning in January 2008.  T.G.I. Friday's awarded HFG

6

50% of its creamy mashed potato requirements and reduced Viands from 100% to 50%.

HFG is a 100% minority owned business, and T.G.I. Friday's recognized Harris for being one of its largest minority suppliers.  T.G.I. Friday's told Harris and Craig Linton that HFG had the opportunity to get 100% of its creamy mashed potato business.

During the time HFG was acquiring 50% of T.G.I. Friday's mashed potato requirement, it was also attempting to market Chef Calvin's brand of retail refrigerated food products for grocery stores.  That effort failed for lack of brand recognition.  In March or April 2008, Harris and Craig Linton made a presentation to T.G.I. Friday's to market the retail products using the T.G.I. Friday's brand.  T.G.I. Friday's agreed, and HFG began sourcing ingredients, designing and obtaining packaging, getting food shots and so on.

HFG hoped that Fresh Vegetable Technology could meet their production needs for 100% of the T.G.I. Friday's creamy mashed potatoes and the seven retail refrigerated food products.  In July 2008, HFG decided that Fresh Vegetable Technology could not meet their needs.

HFG and Reser's.  The same month, Harris ran into Reser's Jim Colee at a trade show and explored whether Reser's could meet its needs.  On August 5, 2008, Calvin Harris and Craig Linton called Peter Sirgy, Reser's Senior Vice President for Sales and Marketing, and proposed that Reser's produce the refrigerated food products, but Reser's was not interested unless HFG brought it the 50% of T.G.I. Friday's mashed potato production it lost in January 2008.[3]  HFG asked Reser's its price for the mashed potatoes.  On

---

[3]Mark Reser testified that in early August he was approached by his sales people about the HFG retail opportunity and the opportunity to regain the 50% of the T.G.I.

August 7, 2008, HFG and Reser's signed a nondisclosure agreement.  (Pl.'s Ex. 5.)  HFG also

signed a letter agreement that guaranteed Reser's price for the mashed potatoes through

December 31, 2009.  (Pl.'s Ex. 32.)  The same day, T.G.I. Friday's purchasing agent, Alex

Oswiecinski, Peter Sirgy and Craig Linton had a conference call about shipping costs.

On August 8, Sirgy, Harris and Craig Linton talked again.  HFG said they thought

they had an imminent opportunity to move 100% of T.G.I. Friday's restaurant mashed

potato product to Reser's.  On August 10, Craig Linton emailed Peter Sirgy asking him for

contacts about the retail project and foodservice.  Sirgy responded that Reser's R&D

director would work with Harris "to coordinate recipe development and samples" for the

retail products.  Sirgy would be the contact for the T.G.I. Friday's mashed potatoes prod-

uct.  On August 11, Craig Linton emailed Sirgy:

> I am send Karen the new customer form.  From my recollection, she also
> handles Viands.  I probably do not need to state the obvious, but she can't let
> the cat out of the bag with Viands.

(Pl.'s Ex. 26.)

On August 15, 2008, Oswiecinski emailed Calvin Harris and Craig Linton:

> Don't worry no balking.  Just looks like the earliest we'll be able to review is
> Monday.
>
> As Calvin and I spoke, I would go ahead with FTV production/shipping of
> orders the week of 8/25.  We should be able to make the switch on all paper-
> work after that as soon as I get the green light.

(Pl.'s Ex. 27.)  That same day Craig Linton emailed Peter Sirgy with a summary of

---

Friday's mashed potatoes sales Viands lost in January 2008.  Fresh Vegetable Technol-
ogy was then producing those mashed potatoes for HFG.  Later in August, HFG said
there was an opportunity to get 100% of the T.G.I. Friday's mashed potatoes business.

Oswiecinski's message.  (Pl.'s Ex. 28.)

On August 20, 2008, Oswiecinski emailed Calvin Harris and Craig Linton providing them with forms they needed to fill out for T.G.I. Friday's "to initiate the switch of PO's." (Plaintiff. Ex. 49.)  That same day, Harris forwarded the email with the forms to Reser's Jim Colee, asking him to complete them.  (Pl.'s Ex. 50.)  Sirgy and Colee separately emailed Harris the forms with the required information filled in.  (Pl.'s Exs. 55 and 56.)  These included a T.G.I. Friday's form that set out the price per pound for the creamy mashed potatoes ingredients, direct costs, indirect costs, and profit.  *Id.*, p. HFG 000667.  On August 21, Craig Linton emailed Oswiecinski the T.G.I. Friday's price information form that had been filled in by Reser's.  (Pl.'s Ex. 63.)

On August 22,  T.G.I. Friday's Alex Oswiecinski emailed Viands' David Linton advising him that Friday's was going to accept bids for 100% of its refrigerated creamy mashed potatoes needs through December 31, 2009.  (Pl.'s Ex. 21.)  David Linton called Mark Reser and told him about the bid opportunity.  Reser said he would provide price information, which he did on August 25.  (Pl.'s Ex. 6.)  On August 26, Viands sent a bid to T.G.I. Friday's.  (Pl.'s Ex. 7.)  That same day, Alex Oswiecinski emailed Viands terminating the supplier arrangement.  (Pl.'s Ex. 22.)

Reser's did not disclose Viands' price information to HFG.  Mark Reser testified that Reser's gave price information to both Viands and HFG.  Reser's did not care who got the business from T.G.I. Friday's.  There is no probative evidence that Reser's disclosed to HFG the price Viands was paying it for the mashed potatoes product.  Reser's merely gave price quotes to the two competitors.  Reser's regularly is in the position of giving quotes to

customers who are competitors.  Moreover, the national restaurant chains who purchase
Reser's products compete with each other.

    <u>T.G.I. Friday's terminates Viands and selects HFG as its sole supplier of mashed
potatoes</u>.  On August 29 T.G.I. Friday's notified Viands that it was terminating it as a
supplier effective September 30, 2008.  (Pl.'s Ex. 22.)  T.G.I. Friday's selected HFG as its sole
supplier for its creamy mashed potatoes.  That decision had nothing to do with Viands'
nondisclosure contract with Reser's; and Reser's played no role in T.G.I. Friday's decision
to select HFG.  It appears from the evidence offered at the preliminary injunction hearing
that it is likely that T.G.I. Friday's selected HFG because Calvin Harris had worked at
Friday's as an R&D chef, he was an experienced executive chef, HFG had successfully
supplied 50% of the mashed potatoes, Friday's was eager to develop Harris's line of
Friday's branded retail food products, and HFG is a minority supplier who fit well with
Friday's minority supplier policy.

    <u>Proprietary information</u>.  The 2001 nondisclosure agreement provided that it applied
to the disclosure of information by Viands to Reser's pertaining to T.G.I. Friday's refrigerat-
ed creamy mashed potatoes.  (Pl.'s Ex. 1, ¶ 1 and Addendum 1.)  (Pl.'s Ex. 1, ¶ 1.)   Reser's
agreed:

> (a)    to hold [Viands'/T.G.I. Friday's] Proprietary Information in strict
>     confidence and to take all reasonable precautions to protect such
>     Proprietary Information . . .;
>
>                         . . .
>
> (c)    to not divulge any such Proprietary Information or any information
>     derived therefrom to any third person;
> (d)    to not make any use whatsoever at any time of any such Proprietary
>     Information except for purposes of this Project . . . .

(Pl.'s Ex. 1, ¶ 2.)     Proprietary Information was defined to "include, without being limited thereto, recipes, specifications, sources of ingredients, process by which it is made, research, cost information and methods of distribution . . . ."  The nondisclosure duty did not apply to information Viands could document "was in possession of or known by [Reser's] prior to receipt from" Viands or T.G.I. Friday's.  (Pl.'s Ex. 1, ¶3(b).)

David Linton testified that everything contained in the creamy mashed potatoes specifications Viands developed for T.G.I. Friday's (Pl.'s Ex. 23.) is confidential proprietary information.  He believes that the price Reser's charged Viands for the mashed potatoes was derived from Viands' proprietary information.

David Linton further asserted that Viands showed Reser's how trucking is done for a national restaurant chain.  Viands routed and tracked the trucks from the time they left the production facility to the time they arrived at a PFG warehouse.

Timeliness is important.  Refrigerated mashed potatoes must be used within 60 days.  T.G.I. Friday's wants to use them in a shorter period of time.  PFG has about eight warehouses.  The individual  T.G.I. Friday's restaurants order the mashed potatoes from PFG.  PFG then ships the potatoes to the restaurant.

PFG sent purchase orders for the mashed potatoes to Viands.  Viands sent a confirmation to PFG and a sales order to Reser's.  Viands kept internal records about each shipment.  (Pl.'s Ex. 16.)

Viands was very diligent in making sure that the product got to PFG on time.  Its customer service department tracked inventory at the PFG distribution centers and called PFG if the supply of mashed potatoes was low and a new order had not been received.

Viands' customer service department also charted the movement of each truck.  Reser's notified Viands immediately if there was a problem with a truck.  Viands contacted PFG to see whether the delay would endanger the supply of mashed potatoes to  T.G.I. Friday's restaurants.

David Linton testified that because there were problems with Reser's trucks and he was afraid that product would not get to the restaurants in time, the 2005 contract provided that Reser's would use Marten Transport to transport the mashed potatoes.  (Pl.'s Ex. 4, Exh. C.)  Viands' developed the Late Truck Notification Procedure included in the con-tract.[4]

Truck routes.  Despite the great care Viands took to try to assure that the mashed potatoes got to PFG when needed, there is no evidence that Viands actually selected truck routes or dispatched trucks.  That was handled by Reser's or the transport company.

_____

[4]The Late Truck notification Procedure provided:
Reser's will provide the following information to Viands as outbound shipments are tendered to the freight hauler:

1. A Customer Service Dispatcher for Reser's will e-mail Viands to in-form them of all tendered loads, confirming carrier, dispatch time and arrival.

2. Reser's will use Marten Transport as the exclusive hauler of the TGIF product.

3. Reser's receives 2 load status updates per day from Marten via e-mail. Reser's Customer Service Dispatcher will use that information to up-date Mary Garrabrant of Viands of any issue that may affect the on time arrival of a load.

4.  Reser's will fax or e-mail the Marten tracking reports, as received, to Viands as a back up.

Further, there is no evidence that Reser's has used Viands' system for auditing transportation to insure delivery of the product manufactured for HFG.

Price Reser's charges for mashed potatoes. Stephany Wilkes testified that she believed that Reser's price to its customers for the T.G.I. Friday's mashed potatoes was Viands' confidential proprietary business information. She conceded that there should be some way Reser's could manufacture T.G.I. Friday's refrigerated creamy mashed potatoes using T.G.I. Friday's recipe and specifications without using Viands' proprietary information. David Linton testified that if Reser's got the specifications for the mashed potatoes from T.G.I. Friday's, it would not violate the 2001 nondisclosure agreement.

Plaintiff's argument that Reser's price to HFG for the mashed potatoes disclosed Viands' confidential proprietary business information is not supported by evidence from which a finder of fact could conclude by a preponderance that Reser's breached the nondisclosure agreement. Reser's was an experienced manufacturer of mashed potato products before it began manufacturing them for Viands. It has its own plant processes and transportation system. Reser's purchased the butter and dairy used to manufacture the mashed potatoes. There is no probative evidence that Reser's price to manufacture T.G.I. Friday's mashed potatoes was derived from confidential proprietary information communicated by Viands to it.

The evidence demonstrates that Reser's was in a position to switch from making T.G.I. Friday's creamy mashed potatoes for Viands to making them for HFG without any delay in delivery because it had been making them for Viands. That is, even when T.G.I. Friday's asked Viands for two sources of supply for the mashed potatoes and Reser's had

13

been successfully manufacturing them for six years at its Pasco plant, it took many months and a number of tries for T.G.I. Friday's to accept the product produced by Reser's at its Topeka plant.  The question before the Court is whether the ability to seamlessly switch from manufacturing T.G.I. Friday's mashed potatoes for Viands to manufacturing them for HFG was based on confidential proprietary information Reser's got from Viands.  If so, the dispositive question is whether use of that information violated the 2001 nondisclosure agreement.

As set out above, Viands offered no evidence at the preliminary injunction hearing from which a finder of fact could find by a preponderance that Viands communicated specific proprietary information to Reser's to help Reser's set up the production line to manufacture T.G.I. Friday's mashed potato product using T.G.I. Friday's recipe and speci-fications.  Consequently, I conclude that Viands has failed to demonstrate the likelihood that it will succeed on its claim that Reser's used its confidential proprietary information to produce T.G.I. Friday's mashed potatoes for HFG in violation of the nondisclosure agree-ment.

Direct sales to T.G.I. Friday's.  The 2001 contract prohibited Reser's from selling mashed potatoes directly to T.G.I. Friday's:

> Immediately upon (i) the decision by either party not to continue the business relationship or (ii) a request by NFP and/or NFP's customer/development partner at any time (which will be effective if actually received or three (3) days after mailed first class postage prepaid to the Recipients address herein), Recipient will turn over to the NFP and/or NFP's customer/development partner all Proprietary documents or media containing any such Proprietary Information and any or all copies or extracts thereof that pertain to the Project, (iii) Recipient agrees not to sell to NFP's current customer for a period of twenty-four (24) months should Recipient be contacted directly by current

14

customer or should recipient contact NFP's customer directly and (iiii) should Recipient attempt direct sales, NFP will be entitled to injunctive relief.

(Pl.'s Ex. 1, ¶ 4.)  The 2003 supply agreement incorporated the prohibition against direct sales contained in the 2001 agreement.  (Pl.'s Ex. 3, ¶ 5.)  The 2005 agreement continued the prohibition:

> The [2001] Nondisclosure and Development Agreement governed the use, disclosure, and ownership of certain Proprietary Information (as defined in that agreement) of Viands and/or TGIF, and limited Reser's ability to access or to sell certain products directly to TGIF.
>
> * * *
>
> The parties agree that the Nondisclosure and Development Agreement shall be superseded by the provisions of this 2005 Supply Agreement as they pertain to the development and sale of mashed potato products to TGIF. Except for the changes contained in this 2005 Supply Agreement, all other provisions of the Nondisclosure and Development Agreement between the parties shall remain in full force and effect, including but not limited to, the requirement for Reser's to maintain the confidentiality of the Proprietary Information, and the provisions of Paragraph 4 of that agreement which prohibit Reser's from making direct sales of mashed potato products to TGIF. Notwithstanding the preceding sentence, commencing 12 months following the later of 1) the end of this 2005 Supply Agreement or 2) the date on which TGIF terminates it's mashed potato relationship with Viands, Reser's will be allowed to contact TGIF directly.

(Pl.'s Ex. 4, ¶¶ D and 5.)(Emphasis added.)

Viands points to its October 2, 2003 contract with Reser's, which relieved Reser's of the prohibition against direct sales in the 2001 and subsequent contracts as to Ruby Tuesdays[5]:

(a) Reser's shall be permitted to receive communications from, or to contact

---

[5]Craig Linton testified that the October 2003 contract was entered after Ruby Tuesday said it did not want to deal with a middle man.  It wanted to deal directly with the manufacturer.

> Ruby Tuesdays directly, **without any further participation by NFP** [Viands]
> in such communications, effective as of September 8, 2003.
> (b) NFP [Viands] agrees to release Reser's from the provisions of paragraph 4
> of the Agreement which would otherwise prohibit Reser's from selling mash-
> ed potato products directly to Ruby Tuesdays, and to permit Reser's to en-
> gage in direct sales with Ruby Tuesdays for mashed potato products without
> any further payments to NFP [Viands].

(Pl.'s Ex. 2, ¶ 1.)(Emphasis added.)  Viands argues that this agreement defines "directly" to mean a sale to T.G.I. Friday's without Viands participating.

The problem with this argument is that there is no ambiguity in the 2005 non-diclosure agreement about the meaning of "direct."  That agreement provided that "should [Reser's] be contacted directly by [T.G.I. Friday's] or should [Reser's] contact [T.G.I. Friday's] directly", Reser's agreed "not to sell to [T.G.I. Friday's] for a period of" one year. (Pl.'s Ex. 1, ¶ 4 and Pl.'s Ex. 4, ¶ 5. )   Here T.G.I. Friday's did not directly contact Reser's; and Reser's did not directly contact T.G.I. Friday's.  Reser's is selling to HFG.   HFG worked for months to acquire 100% of T.G.I. Friday's refrigerated creamy mashed potatoes requirements.  Reser's had no involvement until the negotiations between T.G.I. Friday's and HFG were to the point of HFG making a bid for the business.  Then HFG asked Reser's how much it would charge to manufacture and deliver the product.

The 2003 contract language about direct contacts without the participation of Viands is merely descriptive.  Direct contact with Ruby Tuesdays *on behalf of Viands* was not prohibited by the 2001 contract.  The 2003 contract merely makes clear that Reser's could now directly contact Ruby Tuesdays on its own behalf.  The 2001 contract does not prohibit Reser's from selling mashed potatoes to a third party, who then sells them to T.G.I. Friday's.

If "direct" is to have its usual, well understood meaning, the 2001 contract prohibits Reser's from selling the mashed potatoes to T.G.I. Friday's, bypassing Viands.  It does not prohibit indirect sales, that is a sale to a third party who then sells to T.G.I. Friday's.

The Oxford English Dictionary defines "direct" as "[e]ffected or existing without intermediation or intervening agency; immediate."  The Merriam-Webster online dictionary defines "direct" as "marked by absence of an intervening agency, instrumentality, or influence."  The 2001 agreement prohibited Reser's from making sales of refrigerated mashed potatoes to T.G.I. Friday's "without intermediation or intervening agency," in the "absence of an intervening agency."  Here Reser's is selling to HFG, which is selling to PFG (T.G.I. Friday's agent for distribution of its food to restaurants).  Reser's is not selling directly to T.G.I. Friday's.

Viands also argues that Reser's is making direct sales because its contract with HFG requires Reser's to invoice PFG for certain sales beginning January 1, 2009 and for all sales beginning January 1, 2010.  (Pl.'s Ex. 32, bullet 4.)

Irreparable harm.  David B. Linton, the CEO of Viands, testified that in 1980 he was one of the original founders of Viands Concerted, then known as NFP Corp.  It originally sold to retail food stores, but it was difficult to make money.  About 15 years ago, Viands went to refrigerated food products.  Initially sales were about $1.5 million annually.  They got as high as $25 million.

Viands' approach is to solve problems for customers.  They do not go in to a prospect with a product to sell.  Rather they work with the client to develop or improve a product.  They look for ways to improve quality and reduce costs.

17

Around 1998, Viands adopted a marketing plan to take potatoes to the national level.  They went to the annual restaurant trade show with a booth.  At the second trade show, Boston Market gave Viands the opportunity to make it a refrigerated mashed potato product.  Viands used INK to produce the product.

Orval Kent's Chef Solutions bought INK, which had been producing mashed potato products Viands sold to Boston Market and 3-4 other national restaurant chains.  At the end of August 2002, Chef Solutions entered contracts to sell the mashed potatoes directly to the chains.  That left Viands in a shaky condition with just the mashed potato sales to T.G.I. Friday's as its only national account.

Stephany Wilkes testified that Viands will go out of business if it does not get injunctive relief.  Viands had nine employees until January 2008.  Now it has just three.

Viands now has no sales.  It has been attempting to market Lintonizing, a process for cooked potato slices (potato chips).  It has a patent application pending.  Viands is also in discussions with a national restaurant chain to supply mashed potatoes beginning January 1, 2009.

When Reser's sold the T.G.I. Friday's mashed potatoes to Viands, the sales to Viands were approximately 1.2% of Reser's annual gross sales.  Paul Leavy, Reser's CFO, Treasurer and Assistant Secretary, testified that if Reser's were enjoined from making the T.G.I. Friday's mashed potatoes for HFG it would lose between $500,000 and $800,000 in annual gross profit.

We are just entering a heavy mashed potato season.  If T.G.I. Friday's supply of refrigerated creamy mashed potatoes is disrupted, it may suffer a competitive dis-

advantage.

The injunctive relief Viands seeks is to prohibit Reser's from manufacturing T.G.I. Friday's refrigerated creamy mashed potatoes for HFG for the period of one year.  That remedy would not relieve Viands of its financial distress.  Viands does not have a contract to supply mashed potatoes to T.G.I. Friday's.  Even if it did, Viands does not have a contract with Reser's for Reser's to manufacturer the mashed potatoes for it.  What HFG, which has the supply contract with T.G.I. Friday's, Reser's, and T.G.I. Friday's would do should this Court issue an injunction is speculative and not within the ability of the Court to order.  Suffice it to say that an injunction would not, as a matter of law, relieve Viands of its financial distress.

The relief Viands suggests would flow from an injunction would come only if HFG was unable to supply 100% of T.G.I. Friday's refrigerated mashed potatoes needs, T.G.I. Friday's was willing to contract with Viands to supply some or all of the mashed potatoes, and Viands could convince Reser's or another company to manufacture them.  Each of these variables is beyond the jurisdiction of this Court to control.  There is no factual record sufficient to reliably predict what might happen if the Court issued an injunction.

Fresh Vegetable Technology was producing 50% of T.G.I. Friday's mashed potatoes needs for HFG.  Assuming either that Fresh Vegetable Technology would be unwilling or unable to resume supplying 50% or more of T.G.I. Friday's mashed potatoes needs, another manufacturer might be willing to step in and produce the mashed potatoes.  From Viands' experience with Reser's and HFG's with Fresh Vegetable Technology, it might take anywhere from six weeks to six months or a year for a new manufacturer to produce mashed

19

potatoes acceptable to T.G.I. Friday's.  Depending on T.G.I. Friday's business judgment and its willingness to continue to work with a former supplier who has put it in a bind, it might decide to contract with Viands or pursue one of the alternatives outlined above.  Similarly, if T.G.I. Friday's contracted for Viands to supply some or all of its mashed potatoes needs, Reser's would have to decide whether it was willing to manufacture them.  At the hearing on the preliminary injunction, Reser's Fine Foods' CEO Mark Reser testified that in the event the Court issued the injunction it would not supply Viands.[6]

Where a party seeks a preliminary injunction, the court must consider the following factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998), citing *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir.1997) (en banc)

**Likelihood of success**

A party "is not required to prove his case in full at a preliminary injunction hearing."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Nevertheless, "[i]n order to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success."  *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.

---

[6]Viands has a negative cash flow and owes Reser's over $312,000 for product shipped in late August 2008.

1997), citing *Mason County Med. Ass'n. v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977).  "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id.*, citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

In this case, as the Court noted above, there simply is insufficient evidence to demonstrate that Viands communicated any proprietary business information to Reser's which enabled it to produce the mashed potatoes.  There is insufficient evidence to demonstrate that Reser's disclosed Viands' price information to HFG.  Furthermore, there is insufficient evidence to demonstrate that Reser's violated its agreement with Viands by selling directly to Friday's, through the means of a sham middleman or otherwise.  Consequently, the Magistrate Judge cannot find at this time that Viands has a "strong" likelihood of success on the merits, sufficient to justify the issuing of a preliminary injunction.

**Irreparable injury**

A court must also determine whether the party seeking a preliminary injunction will suffer irreparable injury without the injunction.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  Generally speaking, the damage to customer relationships which results from unfair competition is the type of injury for which monetary damages are difficult to calculate.  *Certified*

*Restoration, supra*.  Here, at the hearing, Viands hazarded a guess that the Friday's relation-ship might have lasted for years, producing a regular stream of mashed potato orders.

However, it is a necessary corollary to the idea of irreparable injury without a pre-liminary injunction that the injury complained of will in fact be prevented by the injunc-tion.  Here, as noted above, the cessation of mashed potato sales by Reser's to HFG will not itself restore Viands' fortunes.  There still will exist no contract by nonparty Friday's to purchase mashed potatoes from Viands; in addition, the president of Reser's affirmatively testified that his company would have no interest in doing further business with its debtor Viands, whether it was forced to stop selling to HFG or not.  Viands clearly hopes that the issuance of a preliminary injunction will effectively force Friday's and Reser's to do busi-ness with it.  However, the accomplishment of this result is beyond the power of this Court. Therefore, to the extent that Viands will suffer irreparable injury from the lack of further Friday's business, it will, as far as can be determined, suffer this injury whether a prelim-inary injunction is granted or not.

**Substantial harm to others**

TGI Friday's is not a party to this lawsuit.  Little evidence has been presented con-cerning Friday's supply chain, its ability to secure or production lead times for generating alternate supplies of mashed potatoes, or the specific financial impact of a sudden inability to serve this dish to its customers.  Testimony was given that TGIF signature creamy mash-ed potatoes are a dish affected by seasonal demand, and that this season is now beginning or will soon begin, thus clearly rendering a proper supply of potatoes important to TGIF.

Despite this lack of specific information, it is clear that substantial inconvenience and disruption to TGIF's restaurant operations would result from the sudden cessation of Reser's sales to HFG.  TGIF's potato supply contract is with HFG;  HFG;s contract is with Reser's.  With this link in the supply chain cut, TGIF will clearly be deprived of an important product, as a result of a dispute to which it is not a party.  As addressed above, this situation might put Viands in an excellent bargaining position.  However, the likelihood of substantial harm to others who are not parties weighs against this court granting a preliminary injunction.

Furthermore, it should be noted that the motion for temporary restraining order and preliminary injunction, as drafted, requests that this Court restrain Reser's from receiving payments for "the sale of refrigerated mashed potatoes to TGIF or its distributor PFG *or any other distributor*, except sales made through Plaintiff Viands Concerted Inc."  It is unclear what effect such relief would have upon the arrangements amongst Reser's, HFG, and the distributors of TGIF branded refrigerated food products to supermarkets.

**Public interest**

The matter at bar is not one of direct and obvious public interest, as is the situation in litigation involving, *e.g.*, the constitutionality of statutes affecting free speech.  The interests of restaurant or supermarket patrons in the granting or denial of preliminary injunctive relief are not important to this analysis.  The protection of trade secrets and the prevention of unfair competition are matters of public interest.  However, this element of a preliminary injunctive analysis is not directly relevant.

Because Viands Concerted, Inc. has not demonstrated a strong likelihood of success on the merits, because the requested relief would not prevent the irreparable injury complained of, and because there exists in this case the strong possibility of substantial harm to nonparty TGI Friday's, preliminary injunctive relief is inappropriate in this case.  Accordingly, I RECOMMEND that the Motion (Doc. 4) be DENIED.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  See 28 U.S.C. §636(b)(1)(B); Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

s/Mark R. Abel
United States Magistrate Judge