IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

Viands Concerted, Inc.,

      Plaintiff,     Case No. 2:08 cv 914

vs.           Judge Sargus
             Magistrate Judge Abel

Reser's Fine Foods, Inc., et al.,

      Defendants.

**PLAINTIFF VIANDS CONCERTED, INC.'S
OBJECTION TO REPORT AND RECOMMENDATION**

## I. Introduction

   Although Magistrate Judge Abel's Report and Recommendation (Doc. 20, hereinafter "Report") reflects careful consideration of the evidence and arguments, it omits critical facts that proved that Viands supplied "Proprietary Information"[1] to Reser's, and that Reser's disclosed Proprietary Information to a third party.  For this reason, and others discussed below, upon de novo review this Court should reject or modify the recommended disposition and grant the injunctive relief requested by Viands.

## II. Viands demonstrated a likelihood of success on the merits by proving that Reser's violated the nondisclosure provisions of the agreements.

   **A.** Viands proved that it provided Proprietary Information to Reser's.

   Contrary to the Report and Recommendation (Report at 5, et seq.), Viands proved that it disclosed Proprietary Information to Reser's, and that Reser's then disclosed Proprietary Information to a third party.  In this regard, the 2001 Agreement between Viands and Reser's defines Proprietary Information to include "recipes, **specifications**, sources of ingredients, process by which it is made, research, cost information and methods of distribution." (Pl.'s Ex.

---

[1] Reser's acknowledged in its 2001 Agreement with Viands that the "Proprietary Information concerning the Project **has tangible value** and **contains trade secrets**." (Pl.'s Ex. 1 (emphasis added).)

1[2] (emphasis added).)  Viands proved that it jointly developed and owned the specifications with TGI Friday's ("TGIF").  (Tr. at 66:24–67:8; 292:1–10.)  In addition, Viands proved that it disclosed to Reser's the specifications for producing TGI Friday's Creamy Mashed Potatoes (hereinafter the "Product"), none of which were in Reser's possession, or knowledge, prior to being provided to Reser's by Viands.  (Tr. at 292:18–293:21; Report at 3, 5, 11; Pl.'s Ex. 23.)

To conclude that Viands did not communicate any Proprietary Information to Reser's is to ignore the evidence referenced above as well as to ignore the clear and unambiguous language of the 2001 Agreement.  In the 2001 Agreement, Reser's (a sophisticated corporation with as many as 2,400 employees and annual revenue of almost $700,000,000[3]) affirmed in writing that it was receiving Proprietary Information which it agreed to hold in strictest confidence and not use for any purpose other than the Project with Viands.  Concluding that no Proprietary Information was shared between the parties -- when they agreed in writing that it was -- would render the material provisions of the 2001 Agreement meaningless.  This Court should give full effect to the freely negotiated agreements between Viands and Reser's, all of which reflect that Reser's received Proprietary Information from Viands.

**B.**  Viands proved that Reser's disclosed the Proprietary Information provided to it by Viands to one or more third parties.

Viands further proved that Reser's disclosed Proprietary Information, in the form of specifications that were provided to Reser's by Viands, to Harris Food Group ("HFG") in violation of ¶¶2(a), (c), and/or (d) of the 2001 Agreement.  In particular, Viands proved that HFG asked Reser's for the specification data and, in violation of Reser's agreements with

---

[2] The 2001 Agreement was followed by two subsequent agreements, in 2003 and 2005 (Pl.'s Ex.'s 3 and 4, respectively), both of which incorporate all confidentiality provisions by reference, except as specifically modified. As such, Viands' references to the confidentiality obligations in the 2001 Agreement should be deemed to imply that Viands is referencing the reincorporation of those obligations via the 2003 and/or 2005 agreements, unless notation to the contrary is made.

[3] Report at 3-4.

Viands, Reser's disclosed the specification data to HFG.

Viands proved that Reser's disclosed the specifications to HFG by way of a simple email chain. Specifically, on August 20, 2008, TGIF representative Alex Oswiecinski emailed HFG representatives Calvin Harris and Craig Linton, providing HFG with various blank specification forms and asking that the forms be filled in "to initiate the switch of PO's" for the Product to Reser's. (Pl.'s Ex. 49[4].) That same day, HFG's Calvin Harris forwarded the email and the forms to Reser's Jim Colee, asking him to fill in the specification information. (Pl.'s Ex. 50.) Reser's representatives Peter Sirgy and Jim Colee then separately emailed back to HFG the forms **with the specifications filled in**, thereby disclosing Proprietary Information in violation of the 2001 Agreement. (Pl.'s Exs. 55, 56.) These specifications included a TGIF form that set out the price per pound for the creamy mashed potatoes ingredients, direct costs, indirect costs, and profit, all of which are information derived from the specifications and thus protected from disclosure. (Pl.'s Exs. 55, 56 at HFG 000667.) Later, on August 21, Craig Linton also emailed Oswiecinski a specification form that had been filled in by Reser's. (Pl.'s Ex. 63.)

The 2001 Agreement defines Proprietary Information to include specifications and, although the specifications were jointly owned by TGIF and Viands, nowhere does the 2001 Agreement limit Reser's confidentiality obligations if Proprietary Information is jointly owned. The undisputed evidence shows that Viands provided the specifications to Reser's, and that Reser's then disclosed the specifications to HFG in direct violation of ¶2(a) of the 2001 Agreement (requiring Reser's to "hold Proprietary Information in strictest confidence"), in violation of ¶2(c) of the 2001 Agreement (prohibiting Reser's from "divulg[ing] any such

---

[4] The forms in Pl.'s Ex. 49 are identical to forms found in the Viands/TGI Friday's specifications book (Pl.'s Ex. 23), except that the forms appurtenant to Pl.'s Ex. 49 are blank and do not include the actual specification information. The specification data used to complete the blank forms is contained in the specifications book (Pl.'s Ex. 23) which, as discussed above, Viands had provided to Reser's, and Reser's then disclosed to HFG.

Proprietary Information or any information derived therefrom to any third person"), and in violation of ¶2(d) of the 2001 Agreement (prohibiting Reser's from making "any use whatsoever at any time of such Proprietary Information except for purposes of this Project"). The Report and Recommendation's should be reversed or modified because Viands proved that it communicated Proprietary Information to Reser's, which Reser's disclosed to a third party.

**C.** Viands proved that Reser's disclosed information derived from the Proprietary Information provided to it by Viands.

Viands proved that Reser's disclosed information derived from Proprietary Information to HFG in violation of ¶2(c) of the 2001 Agreement. As referenced above, Proprietary Information includes "recipes" and "cost information." Also as referenced above, ¶2(c) of the 2001 Agreement prohibits Reser's from divulging Proprietary Information "or any information **derived therefrom** to any third person." (Pl.'s Ex. 1 (emphasis added).) Because the "recipe" for the Product is Proprietary Information, and Reser's used the recipe for the Product in order to calculate a price upon the Product, **any price** that Reser's calculated for **the Product** is, by definition, **derived from** Proprietary Information. Therefore, by providing HFG with any price for the Product, Reser's disclosed information derived from Proprietary Information to a third party in violation of the 2001 Agreement.

The Report and Recommendation's conclusion that there was no violation because "Reser's merely gave price quotes to the two competitors" of Viands is in error. (Report at 9.) Reser's provided HFG with price quotes calculated upon the Product, and the Product is Proprietary Information, so Reser's price upon the Product is derived from Proprietary Information. However, it appears that Magistrate Judge Abel misinterpreted Viands' testimony to reach the conclusion that Reser's disclosure to HFG of a price derived from Proprietary Information did not violate the parties' agreement. In particular, the Report and

Recommendation cites to testimony from Viands' CEO David Linton, who stated that "if Reser's got the specifications for the mashed potatoes from T.G.I. Friday's, it would not violate the 2001 nondisclosure agreement." (Report at 13.)   However, David Linton actually testified that, although TGIF had the right to disclose the specifications, Reser's would still be obligated to meet "all the other covenants" of Reser's agreements with Viands.  (Tr. at 323:11–12).  Although it is theoretically possible that Reser's **might not** have violated the 2001 Agreement **if** TGIF gave the specifications to Reser's, the evidence discussed above proves that this is not what occurred in that Reser's actually passed the specifications along to TGIF (and not vice versa). Therefore, Viands' testimony on this point was merely responsive to an irrelevant hypothetical.[5]

### III. Viands demonstrated a likelihood of success on the merits by proving that Reser's breached the 2001 Agreement by failing to return the Proprietary Information to Viands.

The Report and Recommendation should be reversed or modified for failing to make any mention of either Reser's contractual obligation to return the Proprietary Information to Viands or Reser's failure to do so.  Paragraph 4 of the 2001 Agreement provides that "**[i]mmediately** upon (i) the decision by either party not to continue the business relationship … **Recipient [Reser's] will turn over** to NFP [Viands] … **all Proprietary Information** … and any or all copies or extracts thereof that pertain to the Project." (Pl.'s Ex. 1 (emphasis added).)  As discussed above, Viands proved that Reser's disclosed Proprietary Information (in the form of specifications) to HFG.  As discussed in the Report and Recommendation, and as will be discussed in more detail below, Reser's signed a Nondisclosure Agreement with HFG for the Product on August 7, 2008. (Pl.'s Ex. 5, Report at 7-8.)  Accordingly, no later than August 7,

---

[5] The testimony from Viands' President Stephany Linton on this point is equally irrelevant and speculative. Although the Report and Recommendation accurately recounts that Ms. Linton testified that it could be possible for Reser's to manufacture the Product other than through Viands without breaching any agreement with Viands, she said that she had no idea how.  (Tr. at 116:7–9, 16–19.)

2008, Reser's had taken affirmative steps not to continue the business relationship with Viands, and Reser's should have turned over to Viands all Proprietary Information and any or all copies or extracts thereof related to the Project.  Therefore, as of August 20-21 (when TGIF asked HFG for the specifications, and HFG in turn asked Reser's for the specifications, and Reser's in turn disclosed the specifications), Reser's should **no longer have been in possession** of the specifications because the specifications should have already been **turned back over to Viands**. Reser's failure to do so was a breach of the Agreement, and the Report and Recommendation fails to offer any explanation for why Reser's should not be held responsible for this breach.

Reser's failure to return the Proprietary Information is more than a mere technicality.  No later than August 7, 2008, Viands should have received back from Reser's all copies of the Proprietary Information, the return of which would have alerted Viands of Reser's decision to terminate the business relationship.  Reser's failure to do so kept the proverbial "cat" in the "bag" about Reser's decision until September 3, 2008, when Reser's finally acknowledged what it had done. (Tr. at 317:20–318:4.)  By then, it was too late for Viands to salvage its business dealings with TGIF, and Viands was left to seek relief through this Court.  Craig Linton testified that TGIF confirmed that HFG had been officially selected as TGIF's vendor sometime toward the end of August, and that the timing was inconsistent with Viands being told that bids were not due until August 26.  (Tr. at 175:21–22, 500:25–501:2.)  In addition, Viands did not receive notice that it was terminated by TGIF until August 27, 2008.  (Pl.'s Ex. 22.)  Whether or not Viands could have taken action on or around August 7, 2008 to salvage its dealings with TGIF will never be known.  But Reser's certainly should not benefit from any speculation that Viands **could not** have salvaged the relationship, particularly because Reser's own failure to return the Proprietary Information (and thereby notify Viands of Reser's decision to terminate its dealings

with Viands) prevented Viands from learning what Reser's had done until weeks later.  Although Viands believes that it could have acted to save its business had it learned what Reser's was doing in early August, that question is in dispute.  But there is no dispute that Reser's was obligated to return the Proprietary Information, that Reser's failed to do so, and there should be no dispute that Reser's failure was a material breach of its agreement with Viands.

### IV. <u>Viands demonstrated a likelihood of success on the merits by proving that Reser's used Proprietary Information, in the form of research and information about the process by which the Product is made, for purposes other than the Project.</u>

The Report and Recommendation fails to recognize the significance of the fact that, **but for** Viands working with Reser's to enable Reser's to manufacture the Product, Reser's could not have seamlessly transitioned from manufacturing the Product for Viands to manufacturing the Product for HFG.  Paragraph 2(d) of the 2001 Agreement prohibited Reser's from making "any use whatsoever" of Viands' Proprietary Information (such as information related to the process by which the Product was made and Viands' research) "except for the purposes of this Project." Nevertheless, this is exactly what Viands proved Reser's is currently doing by using its facilities to manufacture the Product for HFG.

There is no dispute that, prior to the 2001 Agreement, Reser's had never manufactured the Product. (Tr. at 292:18–21.)  In addition, there is no dispute that Viands had to work with Reser's for approximately six weeks in order to get Reser's facility located in Pasco, Washington approved by TGIF to manufacture the Product. (Tr. at 400:3–10.)  Furthermore, there is no dispute that the six week duration was a "fast track," and it typically takes several months to get a facility approved. (Tr. at 400:12; 77:1–3; Report at 14.)   In fact, even after Reser's facility in Pasco had manufactured the Product for over six years, it still took "many months and a number of tries" for Viands to get Reser's facility in Topeka, Kansas approved to manufacture the

Product.[6]  (Report at 14.)  Viands' President Stephany Wilkes testified in detail about the time and effort that Viands invested to get the Topeka facility approved. (Tr. at 126:20–131:19.)

As referenced above, Proprietary Information includes the "**process by which** [the Product] **is made**."  Furthermore, the Proprietary Information includes "**research**," and Ms. Wilkes testified about the research that Viands did in order to get the Topeka facility approved, such as verifying the specifications, working with a different potato source, evaluating the water properties, investigating the length of time the Product was in the pipes and the mix times, and checking the manner of creating the dairy blend.  (Tr. at 129:4–6, 129:14–16, 131:3–19.)  Thus, Viands presented ample evidence of Proprietary Information supplied to Reser's with respect to the process by which the Product was made, as well as Viands' research and proprietary knowledge provided to secure the approval of Reser's facilities to manufacture the Product.

Notwithstanding that Viands did not re-engineer Reser's entire production line, the evidence demonstrated as follows: (i) Reser's had never manufactured the Product before Viands came along, (ii) Viands had to invest six weeks of time and effort before Reser's Pasco facility could manufacture the Product, and (iii) Viands invested "many months" of time and effort before Viands could get Reser's Topeka facility approved to manufacture the Product.  **But for** the time Viands spent **researching** and otherwise ensuring that the Pasco and Topeka facilities followed the proper **process by which the Product was made**, Reser's facilities would not have already been approved to manufacture the Product and Reser's simply could not have seamlessly transitioned from manufacturing the Product for Viands one day to literally manufacturing for

---

[6] In January of 2008, TGI Friday's insisted on diversity of manufacturing sources for the Product as well as encouraging diversity/minority vendors, leading to Viands' loss of the right to supply 50% of the Product (and Reser's loss of the right to manufacture 50% of the Product).  (Tr. at 35:14–36:6.)  This is what led Viands to devote the time and effort toward securing approval of Reser's plant in Topeka, thereby curing the perceived deficiency with respect to diversity of manufacturing sources. (Tr. at 38:18–20, 126:20–131:19)  So, in addition to Viands providing Reser's with the Proprietary Information that equipped it to immediately being manufacturing the Product for HFG, but for Viands' time and effort Reser's would not have had the requisite diversity of manufacturing to satisfy TGIF. (Tr. at 401:7–402:7.)

HFG the very next day.  The Report and Recommendation should be reversed or modified because Reser's use of Proprietary Information (including Viands' research and input regarding the process by which the Product was made) for purposes other than the Project (i.e., to manufacture the Product for a direct competitor of Viands) is a breach of Reser's obligation under the Agreement not to make "any use whatsoever" of Viands' Proprietary Information, or information derived therefrom, for purposes other than the Project.

**V. Viands proved that Reser's failed to make sure that employees were advised of, and bound by, the confidentiality obligations owed to Viands.**

The Report and Recommendation should be reversed or modified because it fails to make any mention of Reser's obligation to advise its employees of the confidentiality obligations owed to Viands and, more importantly, fails to hold Reser's liable for designating an officer with no knowledge of the confidentiality obligations owed to Viands as the "contact person" for dealings with HFG that ultimately led to the usurpation of Viands' business with TGIF.  In particular, Viands presented proof of the ubiquitous involvement of Reser's Senior Vice President (Mr. Peter Sirgy) in the covert dealings that led to Reser's facilitating HFG's usurpation of Viands' business with TGIF.  Furthermore, Viands proved that Sirgy was **never advised** of the confidentiality obligations owed to Viands, in violation of ¶2(b) of the 2001 Agreement, which mandates that Reser's "ensure that its employees were advised of, bound by, and comply with" the confidentiality obligations owed to Viands.  The Report and Recommendation omits any reference to ¶2(b) and fails to analyze any of the proof that Reser's violated this provision.

On August 5, 2008, Calvin Harris and Craig Linton called Sirgy and proposed that Reser's produce certain items unrelated to the Product (the unrelated items are generally referred to as "retail"), but Sirgy advised that Reser's was only interested if it could supply 100% of TGIF's mashed potato needs.  (Tr. at 432:3–7, 433:6–9, 457:3–6.)  Later in August, HFG

indicated to Reser's there was an opportunity to take Viands' business and thereby supply 100% of the Product so, on August 7, 2008, HFG and Reser's executed a nondisclosure agreement **signed by Sirgy**. (Pl.'s Ex. 5; Tr. at 433:20–22, Report at 7–8.)  The same day, Sirgy took part in a telephone conversation with TGIF purchasing agent Alex Oswiecinski and Craig Linton about shipping costs related to the Product.   (Tr. at 434:19–435:10, 461:18–462:2.)   On August 8, Sirgy, Calvin Harris and Craig Linton talked again, and HFG said they thought they had an imminent opportunity to move 100% of the Product to Reser's. (Report at 8.)   On August 10, Sirgy advised that he would be HFG's contact for the Product. (Report at 8.)   On August 11, Sirgy got an email from Craig Linton stating as follows:

> I am send [sic] Karen [a Reser's administrator] the new customer form. From my recollection, she also handles Viands. **I probably do not need to state the obvious, but she can't let the cat out of the bag with Viands**.   (Pl.'s Ex. 26 (emphasis added).)

Although HFG may not have initially approached Reser's for the sole purpose of stealing Viands' business, Reser's officer Peter Sirgy insisted that Reser's wanted to manufacture 100% of the Product, which obviously could not happen unless Viands' business was part of the deal. Furthermore, Sirgy was the contact person and was intimately involved in the discussions about taking the business away from Viands.   Nevertheless, Sirgy admitted that he had never read, seen, or been shown the 2005 Agreement with Viands (Tr. at 444:16–17, 445:22–446–1) and had **never been advised** of the confidentiality obligations owed to Viands.  (Tr. at 444:17–20).

Reser's failure to advise Sirgy, its Senior Vice President of Sales and Marketing, of the confidentiality obligations is particularly egregious in light of (i) HFG's admonition that Reser "not let the cat out of the bag with Viands" (which clearly suggests that confidentiality is important, as well as proving the conspiratorial tone and nature of the dealings between HFG and Reser's), (ii) Sirgy's personal involvement in the disclosure of the Proprietary Information in the

form of the Product specifications (as discussed above), (iii) Reser's failure to return the Proprietary Information to Viands, in that Sirgy and Reser's should no longer have possessed the specifications at the time HFG requested them (because the specifications and all other Proprietary Information should have been turned back over to Viands, as discussed above), and (iv) the timing of Reser's participation in the "bidding opportunity" afforded to Viands by TGIF (as will be discussed below).   The Report and Recommendation should be rejected or modified because Viands proved Sirgy's ubiquitous involvement in the covert dealings that led to Reser's facilitating HFG's usurpation of Viands' business with TGIF, without Sirgy ever having been made aware of Reser's confidentiality obligations to Viands.

## VI.   Viands demonstrated a likelihood of success on the merits with regard to its civil conspiracy claim against Reser's.

Viands demonstrated a strong likelihood of success on the merits on its civil conspiracy claim by way of the evidence presented about the "bidding opportunity" purportedly offered to Viands.   In order to obtain 100% of the TGIF business for Reser's advantage, and as discussed above, Reser's desired to misappropriate Viands' trade secrets.   In order to obtain this wrongful advantage, Reser's agreed with Defendants HFG and/or Craig Linton to misappropriate Viands' trade secrets, and did so by way of the wrongful disclosure and use of Viands' trade secrets, thereby causing irreparable harm to Viands.

As discussed above, Reser's and HFG agreed sometime prior to August 7, 2008 that they jointly desired to provide 100% of the Product to TGIF to the exclusion of Viands.   On August 15, 2008 (exactly one week before Viands was even asked to bid on the "opportunity" to regain 100% of TGIF's mashed potato business), Sirgy got an email from Craig Linton summarizing a message from TGIF representative Alex Oswiecinski advising that TGIF already expected to "go ahead with FTV production/shipping of orders [through HFG and Reser's] the week of 8/25. We

should be able to make the switch on all paperwork after that as soon as I get the green light."
(Pl.'s Exs. 27, 28.)   Furthermore, on August 20-21, 2008, before Viands was asked to bid, HFG
and Reser's had already exchanged the emails whereby HFG asked Reser's to disclose the
specifications and (in violation of the 2001 Agreement) Reser's complied and disclosed the
specifications. (Pl.'s Exs. 49, 50, 55, 56, 63.)  Not until August 22, 2008, was Viands advised
that TGIF would purportedly accept a bid to supply 100% of the Product. (Pl.'s Ex. 21.)

Upon receiving notice of the "bidding opportunity," Viands' CEO David Linton
immediately called Mark Reser to tell him about the opportunity, and Reser's then provided the
price information on August 25. (Pl.'s Ex. 6.)  Consistent with HFG's admonition that Reser's
"not let the cat out of the bag with Viands," Reser's failed to advise Viands that, in the days and
weeks before Viands asked Reser's to give a price so Viands could pursue the "opportunity,"
Reser's had already entered into a confidentiality agreement (signed by a Reser's officer who
had no knowledge of the confidentiality obligations owed to Viands) with Viands' direct
competitor to usurp Viands' business, and Reser's had been told that production and shipping of
orders was already scheduled to proceed to the exclusion of Viands.   The Report and
Recommendation should be reversed or modified because the evidence discussed above
demonstrates a strong likelihood of success with regard to Viands' civil conspiracy claim.

**VII. <u>Viands demonstrated a likelihood of success on the merits by proving that Reser's violated the non-competition provisions of the agreements.</u>**

      **A.** <u>The Report and Recommendation fails to hold Reser's liable for having "direct contact with TGI Friday's in violation of Reser's non-competition obligations.</u>

The Report and Recommendation should be reversed or modified because it fails to hold

Reser responsible for having "direct" contact with TGIF in violation of Reser's non-competition

obligations.[7]  Before considering the details of this error, this Court should note the critical point that "direct" contact is **entirely irrelevant** to the discussion of Reser's confidentiality obligations to Viands, which obligations were **unlimited in duration** and **not contingent** upon any characterization of contact being direct, indirect, or otherwise.  The issue of "direct" contact relates **solely to the non-competition** provision of the 2001 Agreements, memorialized at ¶4 of the 2001 Agreement and modified by ¶5 of the 2005 Agreement. (Pl.'s Ex.'s 1, 4, respectively.)

The 2001 Agreement, as modified by the 2005 Agreement, provides that "commencing 12 months following the **later of** …the date on which TGIF terminates it's [sic] mashed potato relationship with Viands, **Reser's will be allowed to contact TGIF directly**."  (Pl.'s Ex. 1 (emphasis added).)  Therefore, Reser's was prohibited from any "contact with TGIF directly" for twelve months after TGIF terminated Viands.  Because Viands was terminated effective September 30, 2008 (Pl.'s Ex. 22), the earliest date that Reser's could have direct contact with TGIF is September 30, 2009.

The Report and Recommendation should be reversed or modified because, notwithstanding the contractual prohibition against Reser's having direct contact with TGIF until September 30, 2009, the undisputed evidence establishes that Reser's **did have direct contact** with TGIF as early as August of 2008.  In particular, on August 7, 2008, a conference call regarding shipping costs related to the Product took place between TGIF's purchasing agent Alex Oswiecinski, Reser's Sr. Vice President Peter Sirgy, and Craig Linton. (Report at 8.) Thereafter, Sirgy personally called Oswiecinski, without any other party on the line, and they communicated regarding butter issues related to the Product.  (Tr. at 437:11–438:2, 438:12–16.)

---

[7] Although the Report and Recommendation discusses the contractual prohibition against "direct sales," which Viands agrees is also forbidden, the Report and Recommendation fails to address the mandate that Reser's would only be allowed "to contact TGIF directly" no sooner than 12 months after the later of the termination of business relations between Reser's and Viands or between TGIF and Viands. (Pl.'s Ex. 4, at ¶5; Report at 14-17.)

In addition, on August 22, 2008, Craig Linton sent an email to Oswiecinski and Sirgy regarding pricing upon the Product. (Pl.'s Ex. 65.)   Applying either of the Court's two definitions of "direct" ("[e]ffected or existing without intermediation or intervening agency; immediate," or "marked by absence of an intervening agency, instrumentality, or influence", Report at 17), the two telephone calls and the email establish that Reser's had direct contact with TGIF regarding the Product prior to September 30, 2009.  In fact, HFG's Calvin Harris admitted that Peter Sirgy being on the phone with Oswiecinski was direct communication (Tr. at 164:19–22), and Sirgy admitted he did not know of any restriction prior to contacting Oswiecinski directly (Tr. at 444:21–23).   These direct contacts constitute breaches of Reser's non-competition obligations owed to Viands and the Report and Recommendation should be reversed or modified to hold Reser's liable for such breaches and granting Viands injunctive relief.

**B.** The Report and Recommendation should be reversed or modified because Reser's was not permitted to manufacture for TGI Friday's, to the exclusion of Viands, simply by interposing a temporary middleman.

The Report and Recommendation should be reversed or modified because the 2001 Agreement cannot reasonably be interpreted to allow Reser's to manufacture for TGIF, to the exclusion of Viands, simply by interposing a temporary middleman (i.e., HFG).  In this regard, Viands proved that HFG is nothing more than a temporary middleman by presenting uncontroverted evidence that HFG and Reser's have **already agreed** that, despite the prohibitions against direct contact **and** direct sales to TGIF any sooner than **September 30, 2009**, Reser's **intends to process orders and invoice TGIF** as of **January 1, 2009**.  In particular, Viands presented an agreement dated August 7, 2008, between Reser's and HFG enumerating in the first sentence that it pertains to "Friday's." (Pl.'s Ex. 32, at bates HFG 000867.)  Although this agreement provides that, initially, HFG would invoice "its customer

[Friday's]" (Pl.'s Ex. 32, at bates HFG 000867, 3rd bullet), Reser's and HFG further agreed that "Reser's will begin to process the orders and invoice your customer [Friday's] … on January 1, 2009." (Pl.'s Ex. 32, at bates HFG 000867, 4th bullet.)  This proves that HFG will only temporarily act as the go-between for TGIF and Reser's because, effective January 1, 2009 (8 months before Reser's is permitted to either directly contact or directly sell to TGIF), Reser's intends to process orders and invoice TGIF directly.  Furthermore, the only reasonable conclusion to be drawn from the August 7, 2008, agreement, by which Reser's states its intention to process orders and invoice TGIF, is that Reser's anticipatorily breached the 2001 Agreement.

Notwithstanding Reser's anticipatory breach of the 2001 Agreement, the Report and Recommendation makes only a fleeting reference to the August 7, 2008, agreement, and offers no analysis of the significance of Reser's intention to directly invoice TGIF. (Report at 17.) Instead, the Report and Recommendation refers to Reser's invoicing "PFG," an entity that is not mentioned in the August 7, 2008 Agreement. (Pl.'s Ex. 32, at bates HFG 000867.)  Regardless, this reference to PFG is irrelevant because all parties had knowledge that PFG is the primary distributor for TGIF and is the entity invoiced when providing Product to TGIF.  As such, invoicing through PFG can only be considered "direct" contact with TGIF.  To conclude otherwise means the entire 2001 Agreement is essentially meaningless regarding "direct" contact/sales because it would mean that Viands itself did not have "direct" contact with TGIF.

**C.**   **"Direct" contact meant any contact between Reser's and TGIF other than through Viands.**

Notwithstanding that Reser's had "direct" contact with TGIF (no matter what definition of that term is used) as established by the phone conversations and email referenced above, the course of dealing between Viands and Reser's, and the totality of the written agreements between them establish that "direct" contact simply meant Reser's contact with TGIF **other than**

15

**through Viands**.  On or about October 2, 2003, the parties reached an agreement regarding precisely that type of communication and sales problems and executed a Settlement Agreement. (Pl.'s Ex. 2.)  The 2003 Settlement Agreement pertains, in large part, to Reser's being permitted to directly contact, and directly do business with, certain of Viands' customers, including Ruby Tuesdays.  The 2003 Settlement Agreement thus provides, with respect to communicating with Viands' customers, as follows:

> (a) Reser's shall be permitted to receive communications from, or to contact Ruby Tuesdays directly, **without any further participation by NFP in such communications**, effective as of September 8, 2003.

> (b) NFP agrees to release Reser's from the provisions of paragraph 4 of the Agreement which **would otherwise prohibit Reser's from selling mashed potato products directly to Ruby Tuesdays**, and to permit Reser's (sic) to engage in direct sales with Ruby Tuesdays for mashed potato products **without any further payments to NFP**. (Pl.'s Ex. 2 (emphasis added).)

Accordingly, "direct" contact/sales with Viands' customers was mutually understood to be any communications in which Viands did not participate or from which Viands did not get paid. Viands saw no need to reinforce, or reincorporate, this agreed-upon definition of "direct" in subsequent agreements (notably the 2005 Agreement) because the parties had already defined the term between themselves in 2003. (Tr. at 312:4–10.)  The Report and Recommendation should be reversed or modified because Viands proved that Reser's is manufacturing the Product for TGIF other than through Viands.

### VIII. Viands proved every requirement necessary to establish its entitlement to injunctive relief.

#### A. Viands proved a substantial likelihood of success on the merits of its claim for breach of contract against Reser's.

Viands proved a substantial likelihood of succeeding on its claim for breach of contract against Reser's.  As discussed above, Viands proved the existence of one or more binding

contracts with Reser's (the 2001, 2003, and 2005 Agreements, Pl.'s Exs. 1, 3, 4.)  By way of the 2001 Agreement, Reser's specifically agreed that Viands "shall be entitled to a [sic] specific performance and injunctive relief (without the need to post a bond or other undertaking) as remedies for any breach or threatened breach."   Viands proved its performance under the agreements by acting as the vendor for the better part of seven years, and proved Reser's failure to fulfill its obligations without legal excuse for the myriad reasons discussed above.  In addition, Viands proved that it suffered damages in the form of lost revenue from TGIF, and lost value of its trade secrets, in that the 2001 Agreement enumerates that the Proprietary Information "has tangible value and contains trade secrets." (Tr. at 57:11–58:7, 358:21–359:4, 360:10–12.)

  **B.**  <u>Viands proved a substantial likelihood of success on the merits of its claim for misappropriation of trade secrets against Reser's.</u>

  Viands proved it will likely succeed on its claim for misappropriation of trade secrets against Reser's.  Ohio Revised Code § 1333.61 defines "trade secrets" to mean "information, including the **whole or any portion** or phase of any scientific or technical information, design, **process**, procedure, **formula**, pattern, **compilation, program**, device, **method, technique, or improvement, or any business information** or plans, financial information, or listing of names, addresses, or telephone numbers," that derives independent economic value from not being generally known to other persons who can obtain economic value from the disclosure or use of such information, and that is the subject of reasonable efforts under the circumstances to maintain its secrecy.

  In addition to the simple and unequivocal fact that Reser's (a large, sophisticated business that was represented by counsel) executed a written contract specifically agreeing that the Proprietary Information includes trade secrets, Viands independently proved that the process it supplied to Reser's to manufacture the Product is a trade secret.  Simply put, if Viands did not

possess information that was not known to others, then there would be no reason to have a vendor involved in food service industry transactions. Nevertheless, Viands proved the value of its system from its initial work developing the Product and specifications with TGIF, Viands' research and input regarding the process by which the Product was made in securing approval of Reser's plant in Pasco to manufacture the Product (and Viands' subsequent work securing approval of the Topeka plant), Viands' input regarding methods of distribution of the Product, and Viands' continuous research and monitoring of quality control for the Product. (Tr. at 14:12–16:11, 126:20–131:19, 292:1–10, 305:3–15, 400:3–23.)

Viands proved that it took reasonable measures to protect its trade secret. This Court need look no further than the 2001, 2003, and 2005 Agreements to see proof of Viands' efforts to protect the confidentiality of its information. In addition to the agreements with Reser's, Viands also presented a variety of confidentiality agreements (internal and external) that Viands requires business affiliates and employees to execute. (Pl.'s Exs. 14, 15.) Furthermore, Viands proved that it promptly engaged legal counsel to diligently remedy any actual or threatened confidentiality breaches. (Pl.'s Ex. 9.)

Viands proved that it invested a substantial amount of time and money in developing its trade secret information. Viands' CEO David Linton testified to the approximately thirty years that he has devoted -- nearly his entire professional life -- developing the formulas, processes, and procedures that constitute the body of the trade secret information that was imparted to Reser's. (Tr. at 357:7–9, 358:2–5.) Linton further testified to the substantial time and expense that others would similarly need to expend in order to lawfully acquire and/or duplicate Viands' trade secrets. (Tr. at 358:8–16.) The Defendants presented no evidence to contradict this testimony, so the uncontroverted evidence sustained Viands' burden of proving at the Oct. 23-24

hearing that Viands' possessed trade secrets that were misappropriated by Reser's.

      **C.**  <u>Viands proved that it will suffer irreparable injury without the injunction.</u>

Viands proved that it will suffer irreparable injury without the injunction.  Under Ohio law, irreparable harm exists when there is a substantial threat of material harm that cannot be adequately compensated through monetary damages.  *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1007 (S.D. Ohio 2008).  Examples of such harm include loss of customer goodwill, loss of significant benefits of years of development, experience and training, and loss of customers. *See, e.g., Grief, Inc. v. Corte*, 2008 U.S. Dist. LEXIS 51459 (S.D. Ohio 2008).  Viands presented evidence of exactly this type of harm. (Tr. at 57:11–58:7, 359:1–359:4, 360:10–12.)  There is no evidence to the contrary.

Viands is the only entity involved in this litigation that will no longer exist depending upon whether or not injunctive relief is granted.  Viands comes to this Court seeking equity, and there could be nothing more manifestly inequitable than foreclosing upon a litigants' opportunity (Viands' last and only opportunity) to save itself simply because this Court is skeptical about whether or not Viands will succeed if relief is granted.  Viands might only have the slimmest of chances to survive if relief is granted, but the uncontroverted evidence establishes that Viands has **no chance** to survive if relief is **denied**.

      **D.**  <u>No parties will be unjustifiably harmed if the injunction is granted.</u>

The Report and Recommendation failed to properly balance the likely hardships associated with injunctive relief.  *See, e.g., Grief, Inc. v. Corte, supra*.  The only entity that the Report and Recommendation identifies as being at risk for harm is TGIF, and the only "evidence" of harm is speculation and conjecture because TGIF offered no testimony.  Despite being served with a subpoena to produce documents, and despite complying with the request and

engaging in discussions (through corporate counsel) with Viands' counsel, and despite being courtesy copied with the Complaint, TGIF hired no counsel, sent no representative to the hearing, and filed no motion or other document asserting that it has any concerns about if/how the disposition of this matter will impact its operations.  This **inaction** stands in stark contrast to Calvin Harris' testimony that this is "mashed potato" season, and TGIF would be "devastated" if it could not offer mashed potatoes.  (Tr. at 157:10–11.)  Notwithstanding Mr. Harris' self-interested desire to save HFG's business, and the lack of foundation for his testimony (just because he was once a TGIF chef does not mean he is now TGIF's spokesperson), the only logical conclusion that can be drawn from TGIF's lack of participation in the Oct. 23-24 hearing is that TGIF is not particularly concerned about the outcome and will not suffer any unjustifiable harm.  Regardless, in balancing the conjecture of harm to TGIF against the assured destruction of Viands, the weight of the evidence favors granting Viands relief.

> **E.**  Injunctive relief will serve the public interest.

Injunctive relief will serve the public interest of upholding reasonable, freely negotiated contracts between sophisticated businesses.  Furthermore, the UTSA evinces public policy in favor of safeguarding confidential & proprietary information.

**IX. Conclusion.**

For the reasons discussed above, and incorporating Viands' other pleadings, Viands respectfully asks that the Report and Recommendation be rejected and/or modified to grant Viands a preliminary injunction and restore the status quo consistent with its prayers for relief in its Verified Complaint and TRO Motion.  Furthermore, and because the 2001 Agreement specifically provides that no bond would be required for this injunction, Viands should not be required to post any bond for the relief to be granted consistent with the parties' agreement.

Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN**
A Legal Professional Association

/s/ Nicole VanderDoes

David M. Scott (0068110) Trial Attorney
Gregory H. Melick (0065694)
Nicole VanderDoes (0079736)
50 West Broad Street, Suite 1200
Columbus, Ohio  43215
Telephone: (614) 221-7663
Facsimile: (866) 345-4948
Email: dscott@lnlattorneys.com
Email: gmelick@lnlattorneys.com
Email: nvanderdoes@lnlattorneys.com
*Attorneys for Plaintiff*

and

David W. T. Carroll (0010406)
Carroll, Ucker & Hemmer, LLC
7100 North High Street, Suite 301
Worthington, Ohio 43085
Telephone: (614) 547-0350
Facsimile: (614) 547-0354
Email: dcarroll@cuhlaw.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing PLAINTIFF VIANDS CONCERTED' OBJECTION TO REPORT AND RECOMMENDATION was served upon all counsel of record by means of the Court's CM/ECF System, this 10th day of November, 2008.

/s/ Nicole VanderDoes

_____

Nicole VanderDoes, Esq.