IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VIANDS CONCERTED, INC.,

     **Plaintiff,**

                                 **Case No. C2-08-914**

vs.                               **Judge Edmund A. Sargus, Jr.**

                                 **Magistrate Judge Mark R. Abel**

RESER'S FINE FOODS, INC.,
     et al.,

     **Defendants.**

## OPINION AND ORDER

In late August 2008, Harris Food Group, Inc. ("HFG") became the exclusive supplier of refrigerated creamy mashed potatoes for all of the T.G.I. Friday's restaurants in the United States. Before that time, HFG had supplied 50% of the mashed potatoes to T.G.I. Friday's restaurants, and Viands Concerted, Inc. ("Viands") supplied the other 50% of the product. Viands seeks a preliminary injunction based on its claim that the Defendants were misappropriating its trade secrets and that Reser's Fine Foods, Inc. ("Reser's") was violating a non-disclosure agreement. The Court referred the matter to the United States Magistrate Judge for a Report and Recommendation. Following a two-day evidentiary hearing, the Magistrate Judge recommended denial of Viands' Motion for Preliminary Injunction, through which Viands sought to prevent Reser's from selling Defendant HFG the mashed potato product, which HFG then sells to T.G.I. Friday's. The Court has reviewed the transcript of the hearing, the motions of the parties, and the Magistrate Judge's Report and Recommendation. For the reasons that follow, Viands' Objections to the Report and Recommendation are **OVERRULED** and the Motion is **DENIED**.

**I.**

## A.   Background

Viands filed this lawsuit under 28 U.S.C. § 1332 alleging that Defendant Reser's and Mark A. Reser breached a contract not to disclose Viands' trade secrets and proprietary information. Viands also contends that Defendants Reser's, Mark Reser, HFG, and Craig Linton misappropriated, used its trade secrets to its competitive disadvantage, tortiously interfered with Viands' contract with T.G.I. Friday's, and engaged in unfair competition.  Viands seeks an injunction to prevent Reser's from selling HFG a refrigerated creamy mashed potato product. HFG subsequently sells to Carlson and Carlson Restaurants Worldwide, Inc., the business entity that operates T.G.I. Friday's restaurants and its distributor, Performance Food Group ("PFG"), an independent, nationwide company that warehouses and distributes food products for T.G.I. Friday's and other restaurant chains (collectively "T.G.I. Friday's").

Viands is owned and operated by David Craig Linton and Stephany Wilkes. Their son, Defendant Craig Linton, worked ten years for Viands, but his employment ended on April 3, 2006. In 2001, Viands worked with T.G.I. Friday's to develop a recipe and specifications for refrigerated creamy mashed potatoes. The recipe and specifications are owned by T.G.I. Friday's. (Pl.'s Ex. 23.)  Viands contracted to supply the creamy mashed potatoes to T.G.I. Friday's. Defendant Reser's contracted to produce the potatoes and deliver them to PFG.

Viands operated as a middleman between T.G.I. Friday's and a manufacturer of the mashed potato product.  Reser's manufactured T.G.I. Friday's mashed potato product for Viands since 2001. Reser's Fine Foods operates 13 manufacturing facilities that produce refrigerated prepared food products.  One of the manufacturing facilities has four lines that produce mashed

potato products. Reser's has 30–35 different recipes for refrigerated mashed potatoes. Reser's developed a process for producing refrigerated mashed potato products for national restaurant chains years before first making the T.G.I. Friday's refrigerated creamy mashed potatoes for Viands. For each mashed potato product, Reser's selects the vendors for the potatoes. Reser's buys additional dairy products and spices at one of its production facilities, and blends these ingredients into the mashed potatoes.

A recipe to make mashed potatoes in a restaurant kitchen cannot be used to produce high volumes of refrigerated product as could be produced at a plant. Viands used its expertise to create a recipe and specifications for production that would yield a product acceptable to T.G.I. Friday's. In 2001, Viands selected Reser's, an experienced producer of this type of product, to help fulfill its contract obligations to T.G.I. Friday's.

David Linton testified that Viands supplied the expertise, including all the knowledge acquired with working–everything it had put together working with INK, to Reser's. Linton went to Reser's Pasco, Washington plant and assisted Reser's in setting up the line to produce creamy mashed potatoes acceptable to T.G.I. Friday's. He only observed and never made adjustments to the line or other processes. Within six weeks, Reser's was producing the T.G.I. Friday's mashed potatoes.

During the course of their business relationship, Viands and Reser's entered into several contracts and agreements. Most relevant to this dispute, in 2001, Reser's executed a Supplier Non-Disclosure and Development Agreement, drafted by Viands, which provides among other things that Reser's will not "divulge any such Proprietary Information or any information derived therefrom to any third person." (Pl's Ex. 1, 2001 Agreement, ¶¶ 2(c); Tr. 7: 11 -8: 1).

-3-

Proprietary Information is described as "recipes, specifications, sources of ingredients, process by which it is made, research, cost information, and methods of distribution." (*Id.*, 2001 Agreement, ¶ 1). The agreement applied to the disclosure by Viands to Reser's "of information pertaining to" T.G.I. Friday's refrigerated creamy mashed potatoes. The "formula for the components" of the mashed potatoes was deemed Viands' proprietary information, which Reser's contracted to hold "in strict confidence" and not to divulge to any third person. (Pl.'s Ex. 1, ¶¶ 1 and 2.) Reser's also "agree[d] not to sell to [Viands'] current customer [T.G.I. Friday's] for a period of twenty-four (24) months should [it] be contacted directly by [T.G.I. Friday's] or should [Reser's] contact [T.G.I. Friday's] directly . . . ." (*Id.*, ¶ 4.)[1] The nondisclosure duty did not apply to information Viands could document "was in possession of or known by [Reser's] prior to receipt from" Viands or T.G.I. Friday's. (Pl.'s Ex. 1, ¶3(b).)

The parties continued to operate under this contractual arrangement through supply agreements signed in 2003 and 2005. The latter agreement terminated on March 1, 2008 and was not renewed.

Viands competes with HFG. The owner of HFG, Calvin Harris, worked for T.G.I. Friday's as a research and development chef in 2001 and created the creamy mashed potatoes

---

[1]     Specifically, Reser's agreed to the following:

(a)     to hold [Viands'/T.G.I. Friday's] Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information . . .;

. . .

(c)     to not divulge any such Proprietary Information or any information derived therefrom to any third person;

(d)     to not make any use whatsoever at any time of any such Proprietary Information except for purposes of this Project . . . .

recipe. Harris started HFG in January 2007, and openly went after Viands' T.G.I. Friday's mashed potato business. In July of 2007, T.G.I. Friday's gave Harris the recipe, specifications and a sample of its current mashed potato product.

Craig Linton joined HFG as Vice President in late August, 2007. By that time, HFG was already developing the mashed potato product for T.G.I. Friday's, using Fresh Vegetable Technology to produce it. T.G.I. Friday's approved the product for production beginning in January 2008 and awarded HFG 50% of its mashed potato requirements. Viands, as well as its manufacturer, Reser's, therefore, lost 50% of their mashed potato business with T.G.I. Friday's.

During the time HFG was acquiring 50% of T.G.I. Friday's mashed potato requirement, it was also attempting to market Chef Calvin's brand of retail refrigerated food products for grocery stores. That effort failed. In March or April 2008, however, Harris and Craig Linton proposed to T.G.I. Friday's a plan to market retail products using the T.G.I. Friday's brand. T.G.I. Friday's agreed. HFG began sourcing ingredients, designing and obtaining packaging. HFG intended to use Fresh Vegetable Technology for continued production of T.G.I. Friday's mashed potatoes as well as the new retail refrigerated food products. HFG decided in July 2008 that Fresh Vegetable Technology could not meet its production requirements.

The same month, Harris made acquaintance with a representative from Reser's, Jim Colee, at a trade show and explored whether Reser's could meet HFG's production needs with respect to T.G.I. Friday's mashed potatoes and the grocery refrigerated food products. On August 5, 2008, Harris and Craig Linton called Peter Sirgy, Reser's Senior Vice President for Sales and Marketing, and proposed that Reser's produce the refrigerated food products. Reser's was not interested unless HFG could restore the 50% of T.G.I. Friday's mashed potato production it lost

in January 2008.  HFG asked Reser's its price for the mashed potatoes.

On August 7, 2008, HFG and Reser's signed a nondisclosure agreement. (Pl.'s Ex. 5.) HFG also signed a letter agreement that guaranteed Reser's price for the mashed potatoes through December 31, 2009.  (Pl.'s Ex. 32.)  The same day, T.G.I. Friday's purchasing agent, Alex Oswiecinski, Peter Sirgy and Craig Linton had a conference call about shipping costs.  On August 8, 2008, Sirgy, Harris and Craig Linton talked again, during which Harris said they thought they had an opportunity to move 100% of T.G.I. Friday's restaurant mashed potatoes to Reser's. On August 10, 2008, Craig Linton emailed Peter Sirgy asking him for contacts about the retail project and food service.  Sirgy responded that Reser's R&D director would work with Harris "to coordinate recipe development and samples" for the retail products and that he would be the contact for the T.G.I. Friday's mashed potatoes product. On August 11, Craig Linton emailed Sirgy: "I am send [sic] Karen the new customer form.  From my recollection, she also handles Viands.  I probably to not need to state the obvious, but she can't let the cat out of the bag with Viands."  (Pl's Exh. 26.)

August 15, 2008, Oswiecinski, of T.G.I. Friday's, emailed Calvin Harris and Craig Linton:

> Don't worry no balking. Just looks like the earliest we'll be able to review is Monday.
>
> As Calvin and I spoke, I would go ahead with FTV production/shipping of orders the week of 8/25. We should be able to make the switch on all paperwork after that as soon as I get the green light.

(Pl.'s Ex. 27.)

On August 20, 2008, Oswiecinski of Friday's emailed Calvin Harris and Craig Linton of HFG providing them with forms they needed to fill out for T.G.I. Friday's "to initiate the switch of PO's." (Pl's Ex. 49.)   Harris forwarded the email with the forms to Reser's Jim Colee, asking him to complete them. (Pl.'s Ex. 50.) Sirgy and Colee separately emailed Harris the completed forms. (Pl.'s Exhs. 55 and 56.) These included a T.G.I. Friday's form that set out the price per pound for the mashed potatoes ingredients, direct costs, indirect costs, and profit. (*Id.* at p. HFG 000667.) On August 21, Craig Linton emailed Oswiecinski the T.G.I. Friday's price information form that had been filled in by Reser's. (Pl.'s Ex. 63.)

On August 22, 2008, T.G.I. Friday's Alex Oswiecinski emailed Viands' David Linton advising him that T.G.I. Friday's was accepting bids for 100% of its refrigerated mashed potatoes product through December 31, 2009. (Pl.'s Ex. 21.) David Linton called Mark Reser and told him about the bid opportunity. Reser provided price information on August 25, 2008. (Pl.'s Ex. 6.) The next day, Viands sent a bid to T.G.I. Friday's. (Pl.'s Ex. 7.) That same day, Oswiecinski emailed Viands terminating its supplier arrangement effective September 30, 2008. (Pl.'s Ex. 22.) T.G.I. Friday's selected HFG as its sole supplier of the mashed potatoes.[2]

Mark Reser testified that Reser's provided price information to both Viands and HFG. Reser testified that he did not care who got the business from T.G.I. Friday's, and that he merely

---

[2]    The Magistrate Judge found that T.G.I. Friday's selected HFG as its sole supplier for its creamy mashed potatoes and that the decision had nothing to do with Viands' nondisclosure contract with Reser's. He found that Reser's played no role in T.G.I. Friday's decision to select HFG. Rather, the Magistrate Judge found that the evidence offered at the preliminary injunction hearing made it more likely that T.G.I. Friday's selected HFG because Calvin Harris had worked at Friday's as an R&D chef; he was an experienced executive chef; HFG had successfully supplied 50% of the mashed potatoes; Friday's was eager to develop Harris's line of Friday's branded retail food products, and HFG is a minority supplier who fit well with Friday's minority supplier policy.

gave price quotes to the two competitors. Stephany Wilkes, the President of Viands, testified that she believed Reser's price for the T.G.I. Friday's mashed potatoes was Viands' confidential proprietary business information. She conceded, however, that it was possible for Reser's to manufacture T.G.I. Friday's refrigerated creamy mashed potatoes using T.G.I. Friday's recipe and specifications without using Viands' proprietary information. Further, David Linton testified that if Reser's obtained the specifications for the mashed potatoes from T.G.I. Friday's, it would not violate the 2001 nondisclosure agreement.

**B.    Magistrate Judge's Report and Recommendation**

The Magistrate Judge found no probative evidence to conclude that Reser's possessed Viands proprietary information or that Viands communicated any proprietary business information to Reser's which enabled Reser's to produce the mashed potatoes. (R&R, pp. 5-6, 9 & 21.) The Magistrate Judge also found that the irreparable harm Viands contends it will suffer in the event a preliminary injunction is not issued, namely that it will go out of business, would not be prevented by an injunction. (R&R, at pp. 21-22.) The requested injunction would only prevent Reser's from selling mashed potatoes to HFG. The Magistrate Judge found that, even if this were to occur, Viands still does not have a contract with T.G.I. Friday's. Further, even if Viands did have a contract with T.G.I. Friday's, the Magistrate Judge concluded that Viands did not present any evidence that it had anyone that could manufacture the mashed potatoes for it because Reser's would no longer do any business with Viands. He concluded that the requested injunction would not benefit Viands, but would harm third-parties, including T.G.I. Friday's, as well as Defendants. (R&R. at p. 23.)

## II.

**A.**    *De Novo* **Standard of Review of Magistrate Judge's Report and Recommendation**

> [A] judge may . . . designate a magistrate judge to conduct hearings, including
> evidentiary hearings, and to submit to a judge of the court proposed findings of fact
> and recommendations for the disposition, by a judge of the court, of any motion
> [for, *inter alia*, injunctive relief] . . . .
>
> [T]he magistrate judge shall file his proposed findings and recommendations under
> subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.
>
> Within ten days after being served with a copy, any party may serve and file
> written objections to such proposed findings and recommendations as provided by
> rules of court. A judge of the court shall make a *de novo* determination of those
> portions of the report or specified proposed findings or recommendations to which
> objection is made. A judge of the court may accept, reject, or modify, in whole or
> in part, the findings or recommendations made by the magistrate judge. The judge
> may also receive further evidence or recommit the matter to the magistrate judge
> with instructions.

28 U.S.C. § 636(b)(1)(B)&(C). Thus, the Court conducts a *de novo* review of those portions of

the Magistrate Judge's Report and specified proposed recommendations to which Plaintiff Viands

has lodged an objection. *See United States v. Quinney*, 238 Fed.Appx. 150, 152-53, 2007 WL

2088696, *2 (6th Cir. June 19, 2007)(unreported)(noting that it is "well-settled" that upon proper

objection, district court must review *de novo* a magistrate judge's ruling on dispositive motions).

**B.**    **Standard for Motion for Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy which would be granted only if the

movant carries [the] burden of proving that the circumstances clearly demand it." *Overstreet v.

Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). A district court has

sound discretion in determining whether to grant or deny a preliminary injunction. *Golden v.

Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996). In determining whether to grant or deny a motion

for preliminary injunction, the Court is required to consider four factors: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant a preliminary injunction; (3) whether a preliminary injunction would cause substantial harm to others; and, (4) whether a preliminary injunction would be in the public interest. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000); *Connection Distributing Co. v. Reno,* 154 F.3d 281, 288 (6ᵗʰ Cir.1998) "None of these factors, standing alone, is a prerequisite to relief; rather the court should balance them." *Kelsey-Hayes,* 73 F.3d at 653. A district court is required to make specific findings concerning each of the factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.* 52 F.3d 1373, 1381 (6ᵗʰ Cir. 1995).

## III.

## A.     Likelihood of Success on the Merits regarding Reser's alleged violation of the nondisclosure provisions of the agreement

The Magistrate Judge's found in his Report and Recommendation "no evidence Viands communicated proprietary information to Reser's," (R&R, at p.5) and that "there simply is insufficient evidence to demonstrate that Viands communicated any proprietary information to Reser's which enable it to produce mashed potatoes." (*Id*. at 21.) In its Motion, Viands alleged that its proprietary information at issue here "includes, but is not limited to, "recipes, **specification**, sources of ingredients, process by which it is made, research, cost information and methods of distribution." (Obj., at p. 1)(emphasis in original). Viands asserts that it jointly developed and owned the specifications with T.G.I. Friday's.

-10-

The Court concludes that Magistrate Judge Abel correctly found that T.G.I. Friday's, not Viands, owns the recipe and specifications for the mashed potato product. David Linton, Viands' owner, testified that T.G.I. Friday's owns the recipe. (Tr. 367, 375.) Viands did not dispute that T.G.I. Friday's owns the recipe for the mashed potatoes. Viands chiefly maintains, however, that it and T.G.I. Friday's jointly owned the specifications for the product. Yet, Viands does not have a written contract or other documentation with T.G.I. Friday's substantiating that Viands had any ownership in the specifications or recipe. Both Craig Linton and Calvin Harris testified that T.G.I. Friday's owned the product specifications and recipe. (Tr. 140,141, 466.) Stephany Wilkes, Viands' president, also testified that T.G.I. Friday's developed and set standard that measures the consistency of the product. (Tr. 85.) T.G.I. Friday's has specific ingredients it requires be used in its mashed potato product. (Tr. 145.) Furthermore, T.G.I. Friday's has specifications for the mashed potato consistency, taste, and appearance. (Tr. 145.) T.G.I. Friday's specification form specifically provides that it exclusively owns all the information contained on its form. (Exh. 56, HFG 00667; Tr. 372-373.) T.G.I. Friday's documents referencing ingredients, laboratory testing, specifications, and formulations, contain a box which is checked, indicating that the information is "Proprietary to T.G.I. Friday's." (Exh. 23, Viands 000010; Tr. 365, 412.)

Moreover, witnesses testified that Reser's owns the manufacturing process. (Tr. 203; 466.) Mark Reser testified that he and his process engineer developed the manufacturing process at Reser's prior to meeting anyone from Viands. (Tr. 203, 206-07.) Reser's produces mashed potato product for many other companies. (Tr. 200-01.) Mark Reser testified, and David Linton agreed, that Linton did not make adjustments to Reser's machines or production line. (Tr. 207;

-11-

363-64.)[3]

Viands asserts that to conclude it did not communicate any Proprietary Information to Reser's ignores the language of the 2001 Agreement. In the 2001 Agreement, Reser's affirmed that it was receiving Proprietary Information which it agreed to hold in strictest confidence and not use for any purpose other than the Project with Viands. Viands, however, however, has failed to *identify* what Proprietary Information, which it owned, that it disclosed to Reser's.[4] Viands focuses its objections on the specifications for the T.G.I. Friday's mashed potatoes, but Mr. Reser agreed that the specifications ultimately belonged to T.G.I. Friday's.[5] Moreover, as set forth more fully above, the preponderance of the evidence demonstrates that T.G.I. Friday's, and not Viands, owns the specifications for the mashed potato product.

Viands also suggests that Reser's disclosed Viands' confidential price information. Viands points to the August 20, 2008 e-mail between T.G.I. Friday's representative Alex Oswiecinski to HFG representatives Calvin Harris and Craig Linton, providing HFG with various blank

---

[3]     Mr. Linton testified that he personally never made adjustments to the processes at the Reser's plants, but that a Viands' culinary team worked with Reser's production and research and development teams for several days. Mr. Linton contends that there were several adjustments made to the cooking of the product. (Tr. 363.) He does not, however, provide any evidence from which this Court could conclude that Viands' provided proprietary information to Reser's, other than his speculation that Reser's could not have manufactured the mashed potatoes without this supposed confidential knowledge.

[4]     At the hearing before the Magistrate Judge, Viands asserted that it gave Reser's a variety of proprietary information including the manufacturing processes related to the product, as well as confidential distribution and trucking information. Viands does not appear to object to the Magistrate Judge's decision as it relates to his findings that it did not have a proprietary interest in Reser's manufacturing or distribution methods. In any event, the Court finds that the evidence does not support a finding that Viands had an ownership interest in these processes.

[5]     "[A]s a professional developer, if T.G.I. Friday's and I parted ways, the specs go back to them." (Tr. 398.)

-12-

specification forms and asking that the forms be filled in. Harris forwarded the email and the forms to Reser's who subsequently emailed back to HFG the forms with the specifications filled in for the price per pound for the creamy mashed potato ingredients. Viands contends that Reser's thereby disclosed Proprietary Information in violation of the 2001 Agreement. The e-mail messages, however, do not reference any of Viands' propriety information. On the form itself, which T.G.I. Friday's developed, it specifically states that "all formulates are property of Carlson Companies [T.G.I. Friday's parent company]," and lists the ingredients and other cost categories. The information Reser's provided as it its price of ingredients and other costs belongs to Reser's. Reser's was an experienced manufacturer of mashed potato products and has its own plant processes and transportation system. Reser's purchased the butter and dairy used to manufacture the mashed potatoes. No probative evidence suggests that Reser's price to manufacture T.G.I. Friday's mashed potatoes was derived from confidential proprietary information communicated by Viands to it.[6]

The Court finds that the preponderance of the probative evidence demonstrates T.G.I. Friday's, not Viands, developed and owns its mashed potato product recipe and specifications. Moreover, the price Reser's provided charged for the mashed potatoes belonged to Reser's and did not implicate any Proprietary Information that belonged to Viands. Viands' objections are OVERRULED. The Magistrate Judge's decision is, therefore, AFFIRMED in this regard.

---

[6]       The 2001 prohibits disclosure of Proprietary Information, "or any information derived therefrom to any third person." (Exh. 1.) Viands maintains that "[b]ecause the 'recipe' for the Product is Proprietary Information, and Reser's used the recipe for the Product in order to calculate the price. . . **any price** that Reser's calculated for **the Product** is, by definition, **derived from** Proprietary Information." (Obj., at p. 4.) This argument is inapposite, however, given that the recipe for the mashed potatoes is not proprietary to Viands, and the price Reser's provided to HFG was its own.

**B.**     **Likelihood of Success on the Merits regarding Reser's alleged breached the 2001 Agreement by failing to return the Proprietary Information**

Viands contends that the Report and Recommendation should be reversed or modified for failing to make mention of either Reser's contractual obligation to return the Proprietary Information to Viands or Reser's failure to do so. Paragraph 4 of the 2001 Agreement provides that "[i]mmediately upon (i) the decision by either party not to continue the business relationship ... Recipient [Reser's] will turn over to NFP [Viands] ... all Proprietary Information ... and any or all copies or extracts thereof that pertain to the Project." (Pl.'s Ex. 1 (emphasis added).) According to Viands, Reser's signed a Nondisclosure Agreement with HFG for the Product on August 7, 2008 and, therefore, no later than August 7, 2008, Reser's should have returned Viands all Proprietary Information and any or all copies or extracts thereof related to the Project. As Viands perceives it, of August 20-21, 2008, when T.G.I. Friday's asked HFG for the specifications, HFG in turn asked Reser's for the specifications, and Reser's disclosed the specifications, Reser's should no longer have been in possession of the specifications because the specifications should have already been turned back over to Viands.

This objection fails because the Court has found that Reser's did not have any of Viands' proprietary information. If Reser's had no proprietary information, it cannot be in breach of the 2001 Agreement by failing to return it to Viands. This objection, therefore, is OVERRULED.

**C.**     **Likelihood of Success on the Merits regarding Reser's alleged use of Proprietary Information, in the form of research and information about processes by which the Product is made, for purposes other than the Project**

Viands maintains that the Report and Recommendation fails to recognize the significance of the fact that, but for Viands working with Reser's to enable Reser's to manufacture the Product,

Reser's could not have seamlessly transitioned from manufacturing the Product for Viands to manufacturing the Product for HFG. Paragraph 2(d) of the 2001 Agreement prohibited Reser's from making "any use whatsoever" of Viands' Proprietary Information (such as information related to the process by which the Product was made and Viands' research) "except for the purposes of this Project." Viands asserts Reser's is currently doing just this by using its facilities to manufacture the Product for HFG.

Viands' argument again fails because Reser's did not obtain Viands' proprietary information. Reser's used its own manufacturing and process information to "seamlessly transfer" producing the product for Viands to Harris. Specifically, Magistrate Judge Abel found as follows:

> The evidence demonstrates that Reser's was in a position to switch from making T.G.I. Friday's creamy mashed potatoes for Viands to making them for HFG without any delay in delivery because it had been making them for Viands. That is, even when T.G.I. Friday's asked Viands for two sources of supply for the mashed potatoes and Reser's had been successfully manufacturing them for six years at its Pasco plant, it took many months and a number of tries for T.G.I. Friday's to accept the product produced by Reser's at its Topeka plant. The question before the Court is whether the ability to seamlessly switch from manufacturing T.G.I. Friday's mashed potatoes for Viands to manufacturing them for HFG was based on confidential proprietary information Reser's got from Viands. If so, the dispositive question is whether use of that information violated the 2001 nondisclosure agreement.

> As set out above, Viands offered no evidence at the preliminary injunction hearing from which a finder of fact could find by a preponderance that Viands communicated specific proprietary information to Reser's to help Reser's set up the production line to manufacture T.G.I. Friday's mashed potato product using T.G.I. Friday's recipe and specifications. Consequently, I conclude that Viands has failed to demonstrate the likelihood that it will succeed on its claim that Reser's used its confidential proprietary information to produce T.G.I. Friday's mashed potatoes for HFG in violation of the nondisclosure agreement.

(R&R at pp. 13-14.) Upon *de novo* review of the record, the Court concludes that the Magistrate Judge's findings are supported by ample evidence. Viands' objections are OVERRULED; the

-15-

Magistrate Judge's Report and Recommendation is AFFIRMED.

**D.    Advising Reser's employees of the confidentiality obligations**

Pursuant to the 2001 Agreement, Reser's agreed to ensure its "employees are advised of, bound by, and comply with this provision (to not sell directly to T.G.I. Friday's)." (Ex. 1, para. 2). Viands objects to the Magistrate Judge's Report and Recommendation on the basis that he should have found that Reser's violated the Agreement by not advising certain employees of its agreement to be bound to protect Viands' confidential proprietary information. Specifically, Viands contends that, because Reser's sales manager, Mr. Sirgy, did not personally review the Agreement prior to this litigation, Reser's failed to properly advise its employees of its obligations to Viands.

The evidence reveals, however, that Reser's complied with this obligation. Mr. Sirgy testified that he had been informed and was aware that Reser's could not sell directly to T.G.I. Friday's for a year after doing business with Viands. (Tr. 440-450.) Although he had not actually seen the document,– and Reser's was not contractually obligated to cause its employees to read it– Sirgy understood the confidentiality obligations owed to Viands. Viands' assertion that Sirgy had absolutely no knowledge of the confidentiality obligations owed to Viands is belied by the evidence and Sirgy's own testimony.

Viands relies on the August 11, 2008 e-mail from Craig Linton of HFG to Sirgy in which Linton said, "I probably do not need to state the obvious, but she can't let the cat out of the bag with Viands." (See Ex. 26.) Craig Linton testified that the email was sent to advise Sirgy to make sure his co-workers complied with the confidentiality agreement between Reser's and HFG. (Tr. 447-48.) Viands' contention that the email reveals a conspiracy between HFG and Reser's is not

-16-

supported by the evidence. Linton testified, is simply unsupported conjecture and speculation on the part of Viands. This objection is OVERRULED.

## E.    Likelihood of Success on the Merits regarding Civil Conspiracy claim against Reser's

Viands insists that it demonstrated a strong likelihood of success on the merits on its civil conspiracy claim. According to Viands, in order to obtain 100% of the T.G.I. Friday's business for Reser's advantage, and as discussed above, Reser's desired to misappropriate Viands' trade secrets. Viands asserts that, in order to obtain this wrongful advantage, Reser's agreed with Defendants HFG and/or Craig Linton to misappropriate Viands' trade secrets, and did so by way of the wrongful disclosure and use of Viands' trade secrets, thereby causing irreparable harm to Viands.

At the outset, the Court notes that Viands did not move for preliminary injunction on its civil conspiracy claim. Its Motion for Temporary Restraining Order and Preliminary Injunction is limited to claims related to misappropriation of trade secrets. Indeed, the Magistrate Judge did not address Viands' claim for civil conspiracy, and made no findings with respect to the likely success of this claim.

Nonetheless, the Court finds that Viands has not demonstrated a substantial likelihood of success on the merits of its claim for civil conspiracy. In the State of Ohio, a civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995) (internal citation omitted). To establish a claim of civil conspiracy, plaintiff must prove: (1) a malicious combination; (2) of two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from

-17-

the actual conspiracy. *Id.* A civil conspiracy claim cannot succeed without an underlying

unlawful act. *Dickerson Internationale, Inc. v. Klockner*, 139 Ohio App.3d 371, 380, 743 N.E.2d

984 (2000); *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

Here, the Court has already determined that Viands is not likely to succeed on the merits

of its underlying claim for misappropriation of trade secrets. Without this improper conduct, the

Court cannot find that Viands is likely to demonstrate that a conspiracy existed between Reser's

and HFG. HFG was actively in negotiations with T.G. I. Friday's in August. The

correspondence Viands relies upon as evidence of a conspiracy merely reflects these business

negotiations between a manufacturer and a distributor. Viands' objection is, therefore,

OVERRULED.

**F.    Liability for "Direct" Contact with T.G.I. Friday's**

Viands contends that the Report and Recommendation should be reversed because it fails

to hold Reser's liable for having "direct" contact with T.G.I. Friday's in violation of Reser's

non-competition obligations. The issue of "direct" contact relates to the non-competition

provision of the 2001 Agreements, memorialized at ¶4 of the 2001 Agreement and modified by

¶5 of the 2005 Agreement. The 2005 agreement provides as follows:

> The parties agree that the Nondisclosure and Development Agreement shall be
> superseded by the provisions of this 2005 Supply Agreement as they pertain to the
> development and sale of mashed potato products to TGIF. Except for the changes
> contained in this 2005 Supply Agreement, all other provisions of the Nondisclosure
> and Development Agreement between the parties shall remain in full force and
> effect, including but not limited to, the requirement for Reser's to maintain the
> confidentiality of the Proprietary Information, and the provisions of Paragraph 4
> of that agreement which prohibit Reser's from making direct sales of mashed potato
> products to TGIF. Notwithstanding the preceding sentence, commencing 12 months
> following the later of 1) the end of this 2005 Supply Agreement or 2) the date on
> which TGIF terminates it's [*sic*] mashed potato relationship with Viands, Reser's

will be allowed to contact TGIF directly.

(Pl.'s Ex. 4, ¶¶ D and 5.)  Viands contends that this agreement defines "directly" to mean a sale

to T.G.I. Friday's without Viands participating and maintains that this provision prohibits Reser's

from any direct contact with T.G.I. Friday's for twelve months after Friday's terminated Viands

on September 30, 2008.

Viands contends that an agreement in 2003 expands the definition of "direct" to mean any

and all communications with T.G.I. Friday's are prohibited.  To support this assertion, Viands

relies on a October 2, 2003 contract with Reser's which relieved Reser's of the prohibition of

direct sales in the 2001 agreement to another retailer, Ruby Tuesday's:

> (a)     Reser's shall be permitted to receive communications from, or to contact Ruby Tuesdays directly, **without any further participation by NFP [Viands]** in such communications, effective as of September 8, 2003.
>
> (b)     NFP [Viands] agrees to release Reser's from the provisions of paragraph 4 of the Agreement which would otherwise prohibit Reser's from selling mashed potato products directly to Ruby Tuesdays, and to permit Reser's to engage in direct sales with Ruby Tuesdays for mashed potato products without any further payments to NFP [Viands].

(Pl.'s Ex. 2, ¶ 1)(emphasis added.)  Viands asserts that this agreement defines "directly" to mean

a sale to T.G.I. Friday's without Viands participating.

The Magistrate Judge concluded that Viands' contention was problematic because "there

is no ambiguity in the 2005 nondiclosure agreement about the meaning of "direct."  (R&R at p.

16.)  Specifically, he concluded that the contracts could not be interpreted in the manner Viands

proposed:

> That agreement provided that "should [Reser's] be contacted directly by [T.G.I. Friday's] or should [Reser's] contact [T.G.I. Friday's] directly", Reser's agreed "not to sell to [T.G.I. Friday's] for a period of" one year.  (Pl.'s Ex. 1, ¶ 4 and

Pl.'s Ex. 4, ¶ 5. ) Here T.G.I. Friday's did not directly contact Reser's; and Reser's did not directly contact T.G.I. Friday's. Reser's is selling to HFG. HFG worked for months to acquire 100% of T.G.I. Friday's refrigerated creamy mashed potatoes requirements. Reser's had no involvement until the negotiations between T.G.I. Friday's and HFG were to the point of HFG making a bid for the business. Then HFG asked Reser's how much it would charge to manufacture and deliver the product.

The 2003 contract language about direct contacts without the participation of Viands is merely descriptive. Direct contact with Ruby Tuesdays on behalf of Viands was not prohibited by the 2001 contract. The 2003 contract merely makes clear that Reser's could now directly contact Ruby Tuesdays on its own behalf. The 2001 contract does not prohibit Reser's from selling mashed potatoes to a third party, who then sells them to T.G.I. Friday's.

If "direct" is to have its usual, well understood meaning, the 2001 contract prohibits Reser's from selling the mashed potatoes to T.G.I. Friday's, bypassing Viands. It does not prohibit indirect sales, that is a sale to a third party who then sells to T.G.I. Friday's. The Oxford English Dictionary defines "direct" as "[e]ffected or existing without intermediation or intervening agency; immediate." The Merriam-Webster online dictionary defines "direct" as "marked by absence of an intervening agency, instrumentality, or influence." The 2001 agreement prohibited Reser's from making sales of refrigerated mashed potatoes to T.G.I. Friday's "without intermediation or intervening agency," in the "absence of an intervening agency." Here Reser's is selling to HFG, which is selling to PFG (T.G.I. Friday's agent for distribution of its food to restaurants). Reser's is not selling directly to T.G.I. Friday's.

(R&R, at p. 16-17.)

The plain language of the non-competition agreement does not prohibit Reser's from selling mashed potatoes to a third party, who then sells to T.G.I. Friday's. Multiple witnesses testified Reser's is not selling directly to T.G.I. Friday's; Reser's is selling to HFG, who in turn is selling to T.G.I. Friday's. No evidence suggests that HFG is simply a fraudulent shell to bypass these provisions.[7] The Court agrees with the conclusions drawn by the Magistrate Judge and finds no

---

[7]     Viands produced an agreement between Reser's and HFG which provided that Reser's would begin to process certain orders and invoice T.G.I. Friday's on January 1, 2009, and for all sales

error in his interpretation of the contracts.

Viands also contends that Reser's had direct contact with T.G.I. Friday's when Mr. Sirgy participated in two brief telephone calls with a T.G.I. Friday's employee and an email that Craig Linton wrote that was sent to both Mr. Sirgy and a T.G.I. Friday's employee. Mr. Sirgy and Craig Linton testified, however, that these instances were simply Reser's answering minor questions by T.G.I. Friday's regarding who owned butter used in the product and a question regarding differences in freight charges between two Reser's plants. (Tr. 183-84; 435-441.)

None of these conversations involved any discussion related to Reser's selling mashed potatoes directly to T.G.I. Friday's. Indeed, Reser's had other direct business with T.G.I. Friday's that did not involve mashed potatoes. To interpret the Agreements to mean that Reser's could not answer questions regarding freight or butter at the request of T.G.I. Friday's extends the Agreements beyond their ordinary meaning and purpose. Viands' objections are, accordingly, OVERRULED.

## IV.

To be entitled to a preliminary injunction, Viands must establish (1) that is has a strong or substantial likelihood of success on the merits; (2) it would suffer irreparable injury if the Court does not grant a preliminary injunction; (3) a preliminary injunction would not cause substantial harm to others; and, (4) a preliminary injunction would be in the public interest. *Leary,* 228 F.3d at 736.

---

beginning January 1, 2010. Viands asserts this document proves that HFG is merely a temporary go-between and evidences an anticipatory breach of the 2001 Agreement. The Court notes, however, that there is no evidence in the record that Reser's actually processed orders directly from T.G.I. Friday's or invoiced the restaurant chain directly with respect to the refrigerated mashed potato product.

-21-

### (1)    Success on the Merits

As set forth above, the Court concludes that Viands has not proven a substantial likelihood of success on the merits of its claims for breach of contract and misappropriation of trade secrets. The record does not support a conclusion that Viands communicated any proprietary business information to Reser's which enabled it to produce the mashed potatoes. There is insufficient evidence to demonstrate that Reser's disclosed Viands' price information to HFG. Furthermore, there is insufficient evidence to demonstrate that Reser's violated its agreement with Viands by selling directly to Friday's, through the means of a sham middleman or otherwise. This factor, therefore, weighs against issuing the injunction.

### (2)    Irreparable harm

The Court must also determine whether the movant will suffer irreparable injury without the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet,* 305 F.3d at 578. Generally speaking, the damage to customer relationships which results from unfair competition is the type of injury for which monetary damages are difficult to calculate. *Certified Restoration*, 511. F.3d at 550.

Stephany Wilkes testified that Viands will go out of business if it does not get injunctive relief. When Reser's sold the T.G.I. Friday's mashed potatoes to Viands, the sales to Viands were approximately 1.2% of Reser's annual gross sales. Paul Leavy, Reser's CFO, Treasurer and Assistant Secretary, testified that if Reser's were enjoined from making the T.G.I. Friday's mashed potatoes for HFG it would lose between $500,000 and $800,000 in annual gross profit.

-22-

As the Magistrate Judge correctly observed, the injunctive relief Viands seeks, prohibiting Reser's from manufacturing T.G.I. Friday's refrigerated creamy mashed potatoes for HFG for the period of one year, would not relieve Viands of its financial distress. Viands does not have a contract to supply mashed potatoes to T.G.I. Friday's. Even if it did, Viands does not have a contract with Reser's to manufacturer the mashed potatoes for it. Moreover, the president of Reser's affirmatively testified that his company would have no interest in doing further business with Viands, whether it was forced to stop selling to HFG or not. An injunction would not, as a matter of law, prevent the irreparable injury Viands asserts it will endure.

### (3)    Substantial Harm to Others

Viands contends it is the only entity that will suffer harm if the injunction is not granted, and that no other party is at risk of harm if the injunction is granted. T.G.I. Friday's is not a party. Viands asserts that T.G.I. Friday's had knowledge of the Complaint, but did not actively participate in the lawsuit. Viands maintains that this inaction on the part of T.G.I. Friday's suggests that it has little concerns about how the disposition of this matter will impact its operations. Yet, the evidence demonstrates that Friday's and other business entities will be harmed if the Court grants the injunction.

T.G.I. Friday's would be cut off from its supply of mashed potato product. As found by the Magistrate Judge, "[w]ith this link in the supply chain cut, TGIF will clearly be deprived of an important product, as a result of a dispute to which it is not a party." (R&R, at p. 23.) Further, Reser's would lose between $500,000 and $800,000 in annual profit. Because the injunctive relief Viands seeks will not prevent the irreparable harm Viands asserts will befall it, and will only harm other parties and non-parties, this factor also weighs in favor of denying

-23-

Viands' request for an injunction.

(4)    **Public Interest**

As the Magistrate Judge found in his Report and Recommendation, this case does not involve an inherent public interest.  The public interest is served, generally, by maintaining smooth business operations.  Here, a non-party to this case, T.G.I. Friday's, would be harmed by the granting of this injunction, and its business operations would be interrupted.

Because Viands Concerted, Inc. has not demonstrated a strong likelihood of success on the merits; because the requested relief would not prevent the irreparable injury complained of; and because there exists in this case the strong possibility of substantial harm to non-party T.G.I. Friday's, the Motion for Preliminary Injunction is DENIED.

**V.**

For the foregoing reasons, Viands Concerted, Inc.'s Objection to Report and Recommendation is **OVERRULED**.  The Magistrate Judge's Report and Recommendation is **AFFIRMED** in all respects, and is hereby **ADOPTED**.  Plaintiff's Motion for Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED.**

_6-16-2009_
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**